485 P.2d 603

**Ellen DUNCAN, Plaintiff-Respondent,**

v.

**Rollin S. DAVIS, Unified Social Services of Arizona, Inc., and Unified Social Services of Idaho, Inc., Defendants-Appellants.**

No. 10745.

Supreme Court of Idaho.

May 28, 1971.

Holden, Holden, Kidwell, Hahn & Crapo, Idaho Falls, for defendants-appellants.

Albaugh, Bloem, Smith & Pike, Idaho Falls, for plaintiff-respondent.

DONALDSON, Justice.

This is an appeal by two social service agencies from a district court judgment awarding control and custody of a child to its natural mother. The mother had petitioned the district court for a writ of habeas corpus in order to secure the return of her son whom she claimed had been unlawfully taken from her. The case does not involve the undoing of an adoption but rather whether the natural mother made a surrender of the child. This case presented an issue of fact to the trial court and for various reasons it found that the surrender, or signing of the required form, was not done with such stability of mind and emotion as to constitute a voluntary relinquishment. However, there was no showing of fraud or trickery by the child placement agency. See, The People ex rel. Olga Scarpetta on behalf of Baby Scarpetta v. Spence-Chapin Adoption Service, 28 N.Y.2d 185, 269 N.E. 787, 321 N.Y.S.2d 65 (1971) (4–7–71).

The pertinent events involved in this appeal occurred in Arizona. In September, 1969, Ellen Duncan, a full blooded Navajo, gave birth to a child out of wedlock. She became pregnant prior to her graduation from high school. The father is also an Indian. After her graduation from high school, Ellen Duncan went to Phoenix, Arizona, to seek medical help and assistance for the impending birth and in placing her baby for adoption. At the Phoenix Indian Hospital, a doctor referred her to a social worker at the hospital. Ellen stayed at the hospital a week and was then referred to the Unified Social Services of Arizona, Inc., (hereinafter referred to as the Arizona Agency), a qualified Arizona child placement agency. The Arizona Agency accepted Ellen into its unwed mothers' program and placed her in a foster home to await the delivery of her child. Immediately subsequent to the birth of her child, she signed a form which purported to re-

linquish her parental rights to the child although as the record indicates she was not aware of the implications and ramifications that signing the form entailed.[1] The record indicates that while Ellen was still at the hospital discussing with the social worker an attempted revocation of the relinquishment that she had just signed, a physician persuaded her not to change her mind but to give up the child for adoption. The baby was born on September 17, 1969, and from this time on the Arizona and Idaho welfare agencies, which work in conjunction with one another, have cared for the child and have since placed it with prospective adoptive parents. After Ellen left the hospital she returned to her native Navajo environment. She contacted her attorney about two weeks after the birth of the child and told him of her plight. Ellen Duncan petitioned the district court for a writ of habeas corpus for the purpose of compelling the adoption agency to release the child to her since she did not fully realize the consequences of signing the form relinquishing her right to the child. Ellen

[1].

"PARENTAL RELINQUISHMENT FOR ADOPTION

KNOW ALL MEN BY THESE PRESENTS that Ellen C. Duncan, also known as _____, the undersigned, being the parent _____
(parent, guardian or relative of at _____ of Baby Boy Duncan, a minor child born in the State of Arileast second degree)
zona on the 17th day of September, 1969, being unable adequately to provide for or care for said minor, hereby surrenders the custody of said minor to ARIZONA RELIEF SOCIETY SOCIAL SERVICE, a child welfare agency duly licensed under the laws of the State of Arizona to care for, maintain, or place children in family homes for care or adoption; and I also hereby relinquish to said agency all rights of every kind or nature which I may have to the custody, services, earnings or control whatsoever over said minor child and hereby consent to the adoption of said child by any person or persons deemed by said agency to be fit and proper adoptive parents. To the best of my knowledge, said minor child was_____ born out-of-wedlock.
(was/was not)

/s/ Ellen C. Duncan
aka _____

WITNESSES:
1. /s/ Vivian S. Griffin
2. /s/ Margaret Rosenhan

STATE OF ARIZONA }
County of Maricopa } ss

ON THIS, the 19th day of September, 1969, before me, the undersigned officer, personally appeared Ellen C. Duncan, known to me to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same for the purpose therein contained.
IN WITNESS WHEREOF I hereunto set my hand and official seal.
My Commission Expires:
Dec. 17, 1972

/s/ Elsie L. Akers
(Notary Public)

This Relinquishment has been duly recorded with, and approved by the Child Welfare Section of the Arizona State Department of Public Welfare on the 24 day of September, 1969.

ARIZONA STATE DEPARTMENT OF PUBLIC WELFARE
By: /s/ Roger J. Hodges
Asst. Director of Child Welfare
/s/ Roger J. Hodges"

Duncan testified that the Navajo concept of adoption as she knew it meant a temporary rather than permanent relinquishment of the child. The record furthermore indicates that although Ellen Duncan understood the English language, it was not her native tongue and when faced with an emotional crisis, might very well state the contrary of what she actually intended. Dr. Sheldon I. Miller, a psychiatrist, deposed:

> "A question I may ask in English will be interpreted quickly by them and answered, and at times I feel they really don't understand the question by virtue of what their answer was. When the question is rephrased through a Navajo interpreter, the answer is diametrically opposed to their first answer in English."

The record reveals that according to Navajo tradition, when a child is born out of wedlock, the child is part of the whole Navajo family and there is a desire to keep the child because "This is their baby." [2] The Bonneville County District Court granted the writ of habeas corpus and ordered the child produced since:

> "* * * it appears that Baby Boy Duncan is illegally detained and restrained of his liberty against the wishes of the petitioner." [3]

The trial court reached this decision because in its opinion,

> "* * * Ellen Duncan did not make a completely voluntary, free and knowing

surrender of her child, and did not have any intention to forever surrender all right or claim to her baby." [4]

The adoption agencies (Unified Social Services, Inc. of Arizona and Unified Social Services of Idaho) have appealed to the Supreme Court from the adverse judgment and although they assign numerous findings of fact and conclusions of law made by the trial court as error, they can be reduced to the contention that the evidence presented at trial does not support the decision to grant the writ of habeas corpus.

It has long been the rule of this Court that findings of fact which are supported by competent and substantial evidence, though conflicting, will not be disturbed on appeal. I.R.C.P. 52(a); [5] Leonardson v. Moon, 92 Idaho 796, 451 P.2d 542 (1969); White v. Boydstun, 91 Idaho 615, 428 P.2d 747 (1967); Linhartsen v. Myler, 91 Idaho 269, 420 P.2d 259 (1966). Furthermore credibility of witnesses and inferences to be drawn from the evidence are for the trial judge, and his findings of fact will not be set aside unless clearly erroneous. Johnson v. Sweeney, 91 Idaho 805, 430 P. 2d 883 (1967). The Supreme Court cannot inquire into credibility of witnesses on appeal since that question rests with the trier of the fact. Patrick v. Bisbee, 52 Idaho 369, 15 P.2d 730 (1932).

The principal issue presented by this appeal is whether the evidence sustains the

2. Deposition: Dr. Sheldon I. Miller

3. Order of the district court granting writ of habeas corpus.

4. Memorandum Decision rendered by the trial court.

5. *"Rule 52(a). Findings by the court— Effect.*—In the district courts, in all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for find-

ings are not necessary for purposes of review. Findings of fact shall not be set aside unless clearly erroneous. In the application of this principle regard shall be given to the special opportunity of the trial court to judge of the credibility of those witnesses who appear personally before it. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. If an opinion or memorandum decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein. Findings of fact and conclusions of law are unnecessary on decisions of motions under rules 12 or 56 or any other motion except as provided in rule 41(b)."

conclusion that the natural mother did not make a voluntary and free relinquishment of the child. Prior to the birth of the child, Ellen Duncan had planned to give it up for adoption.[6] The record indicates that the birth was difficult for Ellen and that her recovery was spent in discomfort. She underwent post-delivery surgery to stop profuse bleeding which occurred after the birth. After the child was born, Miss Griffin, a professional social worker, spent some time, the actual length of which is disputed, with Ellen Duncan discussing the adoption procedures. Miss Griffin once again visited Ellen Duncan for the purpose of securing a termination of parental rights to Ellen's child and visited with Ellen alone and then later two professional social workers were called into the room to witness and acknowledge the relinquishment papers. Ellen testified that she read the relinquishment documents but didn't fully understand them and that Miss Griffin did not explain the nature of the documents to her. However, the two witnesses each testified that Miss Griffin asked Ellen if she had read the papers and understood them and Ellen answered yes. However the same evening Ellen attempted to revoke the purported relinquishment and the next day while discussing the matter with Miss Griffin, a physician in the hospital persuaded Ellen to go through with the adoption.

In addition to all the ordinary incidents of childbirth and the normal pain and suffering attendant thereto, Ellen Duncan, who was undisputedly in an emotionally charged condition,[7] was requested by the adoption agency to sign a certain paper which relinquished all parental rights to the child. She signed the relinquishment form and then she was permitted to see the child and hold it for a short time. The record then reveals that Ellen Duncan was not sure about the consequences and implications resulting from the signing of the form and she informed the adoption agency the evening of the same day she signed the relinquishment that she "wanted the baby." This evidence coupled with the atmosphere of intimidation and apprehensiveness to which Ellen felt she was subjected to by the "Anglos" are strong indications which negative any "consent" and demonstrate that the form was not signed voluntarily by Ellen. As heretofore stated, there is no evidence of either fraud or coercion. However, this Court agrees with the district court in that legitimate doubts have been raised as to whether the mother in fact knew or was made sufficiently aware of the consequences flowing from the signing of the form. D. P. v. Social Service and Child Welfare Dept., 19 Utah 2d 311, 431 P.2d 547 (1967). In a recent case decided by the New York Court of Appeals it was held that where the trial court had found a surrender of an out-of-wedlock child was made without stability of mind and emotion, such findings of fact were to be accepted by the appellate court as immutable. The People ex rel. Olga Scarpetta on behalf of Baby Scarpetta v. Spence-Chapin Adoption Service, supra. A perusal of the Scarpetta case, supra, indicates that the facts presented by the instant case are substantially stronger and dictate a return of the child. The individual involved in the New York case was a mature woman, well-to-do, well traveled, and had received a college education. Yet, the highest court in that state in essence ordered her child to be returned to her because at the time she executed the "surrender document" she was unstable in mind and emotion. The facts in the case at bar reveal that the individual involved was not a mature woman (over 30), but rather a young Indian girl of 19, not a girl of means, but one who had to rely on charitable assistance to have her baby. In light

6. At an interview occurring before the birth of the child between Ellen Duncan and Miss Paxman, a professional social worker, the following information was elicited. "Q. Did you tell Miss Pax-man that you desired to place your baby for adoption at this time? A. Yes."

7. Testimony of the social worker: "It's an emotional time for the girls."

of the facts revealed by this case, the Supreme Court has no choice but to affirm the judgment of the lower court.

Judgment affirmed. Costs to respondent.

McQUADE, C. J., and McFADDEN and SPEAR, JJ., concur.

SHEPARD, Justice (dissenting).

This decision is perhaps the most difficult and Solomonlike that this Court has had or will have for many years, and hence I regret to further compound the problem by dissenting. The decision is particularly difficult for two reasons. First, this Court must decide whether to deprive a natural mother of the future custody of her child, or in the alternative to tear that same child away from the prospective adoptive parents who have had the care and custody of that same child for approximately a year and a half since the child was approximately one week old. We may assume that strong bonds of attachment, love and affection have been formed during that period of time. Secondly, we must decide whether a child born of an Indian father and mother will best be raised and cared for in a non-Indian cultural environment or, on the other hand, whether the child should best be placed with its mother in an environment in which there will be certain aspects of the Indian culture.

I feel impelled to dissent in this case because, in my judgment, the language and the decision of the majority,

"The case does not involve the undoing of an adoption but rather whether the natural mother made a surrender of the child. This case presented an issue of fact to the trial court and for various reasons it found that the surrender, or signing of the required form, was not done with such stability of mind and emotion as to constitute a voluntary relinquishment.",

will tend to jeopardize the adoptive process in this state. In my judgment, a very real interest of society is served by maintaining the adoptive process as inviolate as possible. I see no interest of society to be served by permitting a natural parent, who has relinquished a child, to regain it from prospective adoptive parents after the lapse of time involved in the case herein. The destruction of the relationship between the prospective adoptive parents and the child will be a traumatic experience for all involved. I cannot help but believe that the decision of this Court in this case could well have the effect testified to at trial of impairing the willingness of persons who would otherwise be prospective adoptive parents.

The decision of the majority herein points out that no formal adoption process has taken place. I would point out that the record discloses the only reason that a formal adoption process has not been concluded is the existence of this lawsuit. I see no real distinction between this case and others merely on the basis that a formal adoption procedure was not completed, albeit it was intended, recommended and desired. The emotional upheaval and the tearing asunder of the bonds will be no less intense and I believe the distinction, if it exists at all, is a distinction without a difference.

It is necessary to point out the specific finding of fact by the trial court that the agency (respondent herein) indulged in no misconduct or coercion to gain the relinquishment by the petitioner. The majority opinion contends that a physician persuaded the petitioner to give up the child for adoption. The record indicates that shortly after the birth of the child petitioner's own physician, who may or may not have been connected with the Navajo tribe, discussed with the petitioner the desirability of giving up the child for adoption. Such physician has and had no connection with the agency whatsoever. The record further discloses that petitioner has an older sister whose three children live with their grandparents, and the older sister also recommended and suggested that petitioner herein give up her child for adoption. I

would further point out that the trial court in its findings of fact did not specifically indicate that the said physician exercised any persuasion, undue or otherwise, upon petitioner.

The majority opinion, as heretofore stated, places much emphasis on the mental instability and highly emotional state of the petitioner at the time of the relinquishment. I believe we may take judicial notice of the fact that for any woman the birth of a child involves considerable physical pain and difficulty and a large amount of mental disturbance. We may infer that when the situation is complicated by the illegitimacy factor, the emotional trauma is extreme. There is nothing herein to indicate that these problems and difficulties were in fact any different than any other 19 year old female giving birth of an illegitimate child might sustain.

We come then to what must constitute the real basis of decision for the majority opinion, i. e., inferentially at least, that the petitioner was a simple Navajo girl of Indian culture who did not understand the English language and was misled deliberately or otherwise into giving up her child. I suggest that the record states otherwise. The father of the petitioner is employed in a uranium plant and earning approximately $650.00 per month. Petitioner's two brothers attend college in state universities. Petitioner herself has attended boarding schools since the time that she was eight years old and has not lived with her parents under the Indian culture. The schools which she attended were conducted in the English language and she received good grades of a B average and graduated from high school. Thereafter, she has been employed off the reservation, first as an assembler in an electronics plant, and presently as a nurse's aid in a hospital, earning approximately $300.00 per month. During the time that the petitioner was pregnant her oldest sister was aware of the pregnancy, as was her mother. As above stated, petitioner discussed the matter with her older sister, who recommended to her that she surrender the child for adoption.

The trial court and the majority opinion here place heavy value on the "evidence" of an atmosphere of intimidation and apprehensiveness to which petitioner felt she was subjected by the "Anglos." This "evidence" came in through the medium of a deposition taken of a psychiatrist in Arizona. The deposition was taken without the agreement of the respondent agency or its counsel, and without any representation of the respondent agency thereat. No opportunity for cross-examination was available to the respondent, and in my judgment the admission of that "deposition" into evidence over the objection of the respondent at trial was erroneous. Absent such "evidence," there is no basis in fact for the finding of the trial court of any intimidation or apprehensiveness on the part of petitioner merely by reason of her Indian birth. The record reveals to the contrary.

Although not mentioned in the majority opinion, one further aspect of the case necessitates discussion. At the hearing evidence was presented of the present home life of the child and the desirability of leaving the child therein for the future. Upon motion, the trial court struck all of said evidence and refused to consider it in his determination as to what would be the future best interest and welfare of the child. The trial court, in its memorandum decision, indicated its usage of seven criteria for its decision of the case, among which was the relative abilities of the adoptive parents and the natural parent to rear the child in the manner best suited to its normal development. The trial court stated in its decision that respondents herein refused to disclose the identity of the prospective adoptive parents with whom the child had been placed. The trial court states in its memorandum decision that it had misgivings as to whether it was just and fair to receive the testimony when petitioner had no opportunity to offer any rebuttal testimony or make any "intelligent" cross-examination. The court stated:

"Neither counsel in their brief has submitted any law or authorities upon this

question and the court has not been able to find any upon its own research. However, the court has reached the conclusion that it would be manifestly unfair and unjust for the court to receive and consider such testimony."

It should be pointed out that the record is completely devoid of any proceedings at any time or place indicating any direction by the trial court to disclose the identities of the prospective adoptive parents. The record further indicates that at no place or time during the hearing was any direct question asked by counsel for petitioner as to the present location of the baby. Absent any such indication, the striking of such testimony was erroneous by the trial court and the trial court should have made a finding as to the future best interest of the child.

The majority opinion amply and fairly states the facts as revealed by the record pertaining to the question of the so-called revocation of the parental relinquishment for adoption form. The trial court found that the petitioner "had effectively revoked the parental relinquishment for adoption form." As stated by the majority opinion, the petitioner went through several changes of mind immediately after the birth of the child, but finally concluded that she would relinquish the child. I believe there is no real question herein as to any revocation. The only question is, as stated by the majority opinion, whether or not petitioner knowingly relinquished her child for adoption. I believe the record clearly indicates that she did.

It would serve no purpose to review the status of a revocation of parental assent to adoption across the United States. It is sufficient to say that the various states are split in three categories, (1) consent is absolutely revocable until a final adoption decree, (2) revocation will be allowed at the discretion of the court, and (3) in the absence of fraud or duress, consent is final and irrevocable. 28 University of Chicago Law Review 564. As stated therein:

"A revocation in the course of the adoption process is a serious, often tragic event for the adoptive parents, the agency, the child and, quite likely, the revoking natural parents. It is extremely disheartening for adoptive parents who have invested in a child financially and, more important, emotionally to have it taken from them by a natural parent who has previously consented to the adoption. From the viewpoint of the agency a revocation means that its painstaking efforts to find a home and child suitable for one another have gone for naught. Furthermore, revocations discourage prospective adoptive parents. For the child, revocation may mean an abrupt change in environment after the infant has become settled in the adoptive home. Such a change can seriously damage the child's developing personality. Also, many children placed for adoption are illegitimate. Revocation in these cases deprives the child of its only chance to escape the status and stigma of illegitimacy and thrusts it back into an environment where it has little chance to lead a happy or normal life. For the natural parent, especially if an unwed mother, the return of the child is often not a solution to her problems and may well retard her social adjustment."

It is not my desire that this Court should formulate a rule of law for Idaho such as that enunciated in Gonzales v. Toma, et al., 330 Mich. 35, 46 N.W.2d 453 (1951), to the effect that the execution of a parental relinquishment and consent to adoption "shall terminate the parental rights permanently, beyond the power of the parent to revoke," but rather should adopt the rule enunciated by the Texas court in Catholic Charities of Diocese of Galveston v. Harper, 161 Tex. 21, 337 S.W.2d 111 (1960):

"We hold that where the parents have surrendered their child to the custody of an agency licensed by the State Depart-

ment of Public Welfare to place children for adoption and have given their written consent that such agency may place the child for adoption, that consent is subject to revocation only by proof of fraud, misrepresentation, over-reaching and the like."

If the reader has labored this far with me, it remains only to discuss the two cases cited by the majority opinion. The case of D. P. v. Social Service and Child Welfare Department, 19 Utah 2d 311, 431 P.2d 547 (1967), demonstrates little but that a closely split court differed somewhat bitterly regarding the solution to a problem greatly similar to the case at bar.

The case of People ex rel. Olga Scarpetta v. Spence-Chapin Adoption Service, cited by the majority opinion, demonstrates only that the New York statutes differ from those of Idaho and those of Arizona. As stated in that case:

"In fact, the legislation is clear that, until there has been an actual adoption, or the agency has met the requirements of the Social Services Law * * *, the surrender remains under, and subject to, judicial supervision."

That court further stated:

"Accordingly, the sole issue before us on this appeal is whether there is any evidence in the record to establish that the interest of the child will be promoted by returning the child to the natural mother."

I suggest that such issue is substantially different than that facing the Court in the case at bar.

While there is much to be said for the logic and reasoning of the majority opinion, I think the rule stated in Catholic Charities of Diocese of Galveston v. Harper, supra, will better avoid possible abuses and better serve the interest of the people of this state by protecting and strengthening the adoptive process. The order of the trial court should be reversed.