775 P.2d 611

Patricia STOCKWELL (Porter),
Plaintiff–Respondent,

v.

Robert D. STOCKWELL,
Defendant–Appellant.

No. 17261.

Supreme Court of Idaho.

June 5, 1989.

Givens, McDevitt, Pursley, Webb & Buser, Boise, for defendant-appellant. Paul J. Buser, argued.

Roger L. Williams, Kamiah, for plaintiff-respondent.

HUNTLEY, Justice.

This case concerns custody of a child after a divorce. Some time in the summer of 1975 respondent (Patricia) conceived Amber. A few months later appellant (Dan) and Patricia began dating. On April 4th of 1976 Amber was born to Patricia. On June 4th of the same year Dan and Patricia were married. At Patricia's direction, Dan's name was placed on Amber's birth certificate as her father. March 13, 1978 marked the birth of Dan and Patricia's daughter, Danielle.

On August 3, 1984, Patricia filed for divorce and in her pleading she stated that both children were children of the marriage (even though Amber was born before the marriage and was not Dan's natural child). Prior to disposition of Patricia's complaint for divorce, Patricia and Dan consented to Dan's parents' guardianship of both girls, both agreeing that such guardianship would be in the best interests of the girls. On June 7, 1985, Patricia's divorce complaint was granted. The decree which was entered, however, did not provide for the care, custody or support of Amber and Danielle. Subsequent to the entry of the divorce decree both Patricia and Dan became remarried to other persons. Patricia married Rick Porter and they resided in Canyon County, Idaho. Dan married Rhonda Stockwell and they lived in Portland, Oregon.

On July 18, 1985, Patricia petitioned to terminate the guardianship which had been vested in Dan's parents. On October 21, 1985, there was a hearing on the custody of the girls. The magistrate division entered its Findings of Fact and Conclusions of Law Nunc Pro Tunc on March 14, 1986 to be effective as of October 21, 1985. The Findings and Conclusions included the resolution that the guardianship in the paternal grandparents be terminated. Further, the order entrusted care and custody of the girls to Patricia and granted rights of visitation with both Danielle and Amber to Dan. The judge declined to require Dan to pay support for Amber stating that "no legal basis to impose such" support payments could be found. Further, the Findings and Conclusions ordered that reasonable visitation rights with both children be granted to Dan's parents. Finally, the court admonished all the parties not to reveal Amber's parentage to her. In January of 1986, Dan returned to Canyon County from Portland, Oregon and he pressed for his visitation rights. In March of 1986 Patricia and Rick fled Idaho with both girls and went to Connecticut without leaving a forwarding address with Dan or with the girls' school. Once in Connecticut, Patricia and Rick changed the girls' names in the

Connecticut schools. In the spring of 1986, Dan found the girls in Connecticut after searching for several months.

On July 1, 1986, a second set of Conclusions of Law was entered and in this document the magistrate stated that Patricia's conduct, in leaving the state with the girls, was so pernicious to the parent/child relationship which Dan had established with Danielle that a substantial, material and permanent change of circumstances had occurred which warranted changing the custody of Danielle from Patricia to Dan. The magistrate declined to change Amber's custody from Patricia to Dan but he did order that Patricia return Amber to Dan in Idaho as enforcement of his visitation order regarding an extended visit which was to have occurred from the 15th of June through the 15th of August.

In August of 1986, the Connecticut court entered an order enforcing the magistrate's July 1, 1986 order and Dan brought both girls back to Idaho. On January 13 and 14 of 1987 the court held a hearing regarding a change of both girls' custody from Patricia to Dan and it received evidence relevant to the best interests of Amber and Danielle. The court found that the best interests of Danielle would be served by changing her custody to Dan even though this would necessitate the first separation of the girls in their lives. The court found that this separation would be necessitated because it had no authority to place Amber in Dan's custody since Dan was neither natural nor adoptive parent of Amber.

The court stated that the most compelling consideration motivating its decision was its belief that if Danielle were placed with Patricia, Dan would never be able to see her again. In February of 1987, the magistrate entered an order which placed Danielle in Dan's custody and Amber in Patricia's custody. On the 17th of December, 1987, the district court judge entered a decision affirming the magistrate's ruling regarding custody of Amber. Despite the legal ruling regarding custody of Amber, she has remained in Dan's custody since August of 1986, pursuant to a stay of the order giving Patricia custody. Danielle has

been placed in Dan's residential and physical care and custody pursuant to the February 24, 1987 decision of the magistrate. Thus, both girls have been in Dan's custody since August of 1986 in addition to having been in his shared custody prior to Patricia and Dan's separation (excluding, of course, the period during which the children were under Dan's parents' guardianship). Dan is appealing the rulings providing for placement of Amber in Patricia's custody.

■■■ The paramount consideration in any dispute involving the custody and care of a minor child is the child's best interests. I.C. § 32–717. In custody disputes between a "non-parent" (i.e., an individual who is neither legal nor natural parent) and a natural parent, Idaho courts apply a presumption that a natural parent should have custody as opposed to other lineal or collateral relatives or interested parties. This presumption operates to preclude consideration of the best interests of the child unless the nonparent demonstrates either that the natural parent has abandoned the child, that the natural parent is unfit or that the child has been in the nonparent's custody for an appreciable period of time.

The long standing rule in Idaho is that the welfare of the child is of primary consideration in determining custody rights in children. In the implementation of this rule, this Court has consistently applied the presumption that a natural parent should have custody of his child as opposed to other lineal or collateral relatives or interested parties. The facts at bar, through Ewing's showing of natural parentage, establish in the appellant a prima facie case for custody. The burden therefore shifts to the respondent to prove that Terrence Ewing has forfeited his rights. Such proof requires a showing of clear, satisfactory, or convincing evidence that the parent is patently unfit or has abandoned his child, or as in the factual situation at bar, where an adverse party has custody of the child for an appreciable period of time (in excess of three years), the best interests of the child dictate custody being placed with

the adverse party if the facts show he is better fitted to raise the child than the natural parent.

. . . .

Where an adverse party has had custody of a child for an appreciable period of time, in this case over four years, the custody of the child will be left with that party if the best interests of the child so dictate. Such a finding is proper if the adverse party is shown to be better fitted to raise the child than the natural parent. As such, we reject the appellant's argument that only a mandatory showing of abandonment or patent unfitness will suffice to overcome a natural parent's right.

*In re Ewing*, 96 Idaho 424, 425–27, 529 P.2d 1296, 1298 (1974). In *McGregor v. Phillips*, 96 Idaho 779, 782, 537 P.2d 59, 62 (1975) (Bakes, J., dissenting), Justice Bakes cited *Ewing* and reaffirmed the need for best interest analysis where a nonparent has had custody for an appreciable period.

I agree with the majority that there is a presumption that the natural parent should have custody of the child as opposed to other relatives or interested parties, but in cases such as this, in which the non-parental party has introduced sufficient evidence to rebut the presumption, the trial court must weigh the evidence presented and decide the case, not on the basis of any presumption, but on whether or not a change in the actual custody is in the best interests of the child. As I read the conclusions of law of the trial court, it appears to me that the trial court may have concluded that if the mother has not "forfeited" her rights to the child by abandonment, or was not otherwise unfit by her conduct, then the parent was automatically entitled to custody. But where, as in this case, the parent has turned the child over to its grandparents when she was just an infant, and the grandparents are really the only parents which the child has ever known, and where the mother is a stranger to the child as the petitioner is in this case, to automatically change the custody of the child to the mother without an express finding that it is in the child's best interests for the custody to be so changed, is to reduce the child to the status of a chattel. Children are not chattels, nor are they to be awarded to the least blameworthy of two litigants. The primary consideration in these cases should be what is in the best interests of the child, after considering all of the factors involved.

It is thus clearly established under Idaho precedent, that where a child has been in the custody of a third party for an appreciable period of time (and thereby developed a bond with that person), the custody of the child will be awarded to that party if the best interests of the child so dictate. *In re Ewing*, 96 Idaho at 425–26, 529 P.2d at 1297–98. In this circumstance, neither "a mandatory showing of abandonment nor of patent unfitness" is necessary to overcome a natural parent's right. *In re Ewing*, 96 Idaho at 427, 529 P.2d at 1299.

▮ In the present case, the magistrate division and district court essentially held that in order for Amber to have her best interests considered, Dan had the burden of showing that Patricia had forfeited her rights to custody by abandonment or was unfit or unable to properly care for the child. These rulings were in error.

Virtually from the time of Amber's birth, Dan has been the only person she has known as her father. In fact, she did not know that Dan was not her natural father until Patricia informed her of that fact after the October 1985 proceeding and in contravention of the Magistrate's specific order that the parties not reveal her parentage. Prior to their separation, Dan had custody equivalent to the custody rights Patricia enjoyed and Dan has essentially had sole custody for the past two and one-half years. In view of the longstanding, substantial custodial and parental relationship Dan has had with Amber, the lower courts were clearly obligated under settled Idaho law to consider Amber's best interests in determining who should be entrusted with her custody. Therefore, the decisions of the lower courts regarding the custody of Amber are reversed and the

case is remanded for further proceedings consistent herewith.

■ Our remand is subject to the following directions. Our review of this record reveals that the proceedings to date in this file have been unusually acrimonious and expensive. It is obvious that the parties have expended thousands of dollars in attorney fees, travel expenses, and loss of time from employment, while pursuing interests other than those which might be expected to be in the best interests of the child as distinguished from the best interests of the parents and their respective families. It is a case where all might benefit if they were to cooperate in seeking a mutually satisfactory resolution through a mediation process wherein all concerned focus on seeking the best interests of the children. Accordingly, we direct that the trial court, prior to the conduct of further formal custody hearings, require the parties to undergo a mediation process under the auspices of the district court before a qualified mediator. (*Cf.* California Civil Code § 4607(a) (West Supp.1983) (providing for mandatory mediation between divorcing couples if custody issues are at stake); *See Also* L. Riskin, *The Special Place of Mediation in Alternative Dispute Processing*, 37 U.Fla.L.Rev. 19; ABA, *Alternative Means of Family Dispute Resolution*, and J. Pearson, *How Child Custody Mediation Works in Practice*, 20 Judge's J. 11.) In the event the court-ordered mediation does not result in a mutually satisfactory resolution of the custody issues, the court will then, upon motion of either party, conduct further hearings consistent herewith.

Costs on appeal shall be divided equally between the parties, no attorney fees awarded.

BAKES, C.J., and JOHNSON, J., concur.

SHEPARD, J., sat but did not participate in the opinion due to his untimely death.

JOHNSON, Justice, concurring specially.

I fully concur in the majority opinion. I write only to elaborate on the mediation that is required on remand.

In addition to the references given in the majority opinion describing the process of mediation in divorce, I refer the parties and the trial court to J. Folberg and A. Milne, *Divorce Mediation: Theory and Practice* (The Guilford Press 1988). This thoughtful and informative book is a comprehensive introduction to the process by which professional mediators assist divorcing couples to reach their own agreements concerning the most important result of their marriage—their children. I also recommend to the parties and the trial court a viewing of the video tape entitled "In the Best Interest of the Child." This video tape was produced by the Administrative Office of the Courts of Idaho and features Judge Patricia G. Young, Magistrate of the Fourth Judicial District, interviewing Dr. Judith Wallerstein, a leading authority on the use of mediation in resolving issues relating to children in divorce cases.

I also offer to the parties a portion of one of the articles in *Divorce Mediation:*

The legal adversarial system asks, "Who will be awarded custody of the minor children?" The result is that the parent who is not awarded custody is then labeled a noncustodial, visiting parent. In many ways, this question is much like the law school professor's example of an inappropriate leading question, the most famous of which is, "When did you stop beating your wife?" Just as the wife-beating question assumes an answer by the way it is asked, the usual custody question assumes that it is necessary to determine two levels of "ownership" of the minor children. This is absurd, because the question of ownership need not even be asked; the focus should be establishing the parenting obligations that must be practiced in the future by the spouses.

. . . .

A more appropriate question to ask the divorcing couple is, "What future parenting arrangements can you agree to, so that each of you can continue to be involved, loving parents?" This version of

the custody question creates a different focus and a very different outcome. First, the question is mutual, and answering it requires cooperation. Asking "Who shall have custody?" creates a competitive focus and is likely to produce an adversarial or fighting response, but asking the couple to agree to create certain parenting arrangements requires collaborative discussions and mutual planning.

Second, the question is future oriented. Mediation pushes couples to look more to the future because it can be controlled and changed. When the mediator asks a future-oriented, mutual question, couples find it easier to work through the difficult task of being two parents living in different houses.

*Id.*, S. Erickson, "The Legal Dimension of Divorce Mediation," at 105, 108–09.

My hope for the parties is that they will enter into the required mediation with a desire to resolve the conflict over custody in this case in a way that will be to the best interest of the children and, ultimately, themselves.

BISTLINE, Justice, dissenting.

When we heard oral argument in January 1989, my strong recollection is of a general consensus that the pivotal issue in this case was the validity of the stay order entered by Judge Doolittle. In Justice Huntley's opinion the stay order is barely mentioned and then only as an historical fact in connection with the recitation that the trial court, Judge Drescher, placed Amber in Patricia's custody, and that Judge Doolittle, acting in the capacity of an appellate court, affirmed Judge Drescher's order so placing Amber's custody. That order was entered in February of 1987. The order prior thereto touching upon Amber's custody had been entered on March 14, 1986. That order relieved Dan's parents of the custody of Amber (and Danielle as well), which custody was pursuant to an earlier

consent decree of guardianship vesting the custody of both girls in Dan's parents. The consenting parties were Dan and Patricia. The willing parties, Dan's parents, agreed to act as guardians, and did so for some time.

The same order of March 14, 1986, which so relieved the grandparents of guardianship duties, placed both Danielle and Amber with their mother, Patricia. The same order afforded visitation rights of both girls to the paternal grandparents, such being but a putative characterization as to Amber, who was not a child of Dan's nor a grandchild of Dan's parents. As Justice Huntley has pointed out, Judge Drescher did not require Dan to provide Patricia with any child support for Amber. Justice Huntley's opinion does not advise whether Dan voluntarily made payments to help with Amber's support. If one were to assume that he did, such would lend some small support to the result which the majority strives to attain. If he did not, such would militate against him.

Then, as I read through Justice Huntley's opinion, following the March 14, 1986 order, when Dan thereafter returned to Idaho from Oregon and pressed for his visitation rights under that order, Patricia and her husband moved to Connecticut,[1] allegedly leaving no address where they could be reached, and thereafter taking measures said to be aimed at their remaining unfound.

In July of 1986, at a proceeding where Patricia and Patricia's then attorney did not appear, Judge Drescher, after hearing testimony from Dan and his witnesses, changed Danielle's custody from Patricia to Dan. Amber's custody was continued in Patricia. Patricia was ordered to return Danielle to Dan.

As to Amber, we are informed that, because the escapade to Connecticut had precluded Dan from enjoying a court-scheduled right of visitation which Dan had earlier been given, apparently, the Connecticut

---

1. Before moving to Connecticut they sought and obtained legal advice, which was from counsel other than now representing them. That advice was to the effect that nothing in the court's decree prevented them from leaving Idaho. La-

ter on, Judge Drescher would comment that Patricia had a right to take Amber, and he expressed some wonder that the Connecticut court had ordered the return of *both* girls to Idaho.

court may be responsible for ordering Amber's return to Idaho, presumably for the fulfillment of Dan's lost visitation with Amber. This is unclear, but does not appear to be a dispositive factor at this time.

Then, as we see, there was a further hearing held on January 13 and 14, 1987, at which Patricia was present with counsel, following which Judge Drescher placed custody of Amber in Patricia and custody of Danielle in Dan, and afforded Patricia visitation rights with Danielle. An order to that effect was entered on February 20, 1987. In that same order Judge Drescher provided that such visitation with Danielle was conditioned on posting a surety in the sum of $15,000 to insure the return of Danielle to Dan.

That order resulted in an appeal by Dan, taking the case before Judge Doolittle. While both girls were in Dan's physical custody, and Danielle in his legal custody, Patricia, at the end of May 1987, moved Judge Doolittle for an order allowing her visitation with Danielle. Because the visitation would be at Patricia's residence in Connecticut, Judge Doolittle stated that the two girls while there were to receive letters and telephone calls from relatives. The children were delivered to Patricia forthwith so that they and she could make it to the airport the same day. Nothing in the record suggests in the slightest that any problems developed because of this visit— nor with a like visit the following summer of 1988.

Judge Doolittle took the appeal of Judge Drescher's custody order under advisement. In affirming it Judge Doolittle carefully and specifically addressed therein Dan's claim to custody of Amber:

## CUSTODY OF AMBER

Dan sought custody of his step-daughter, Amber, under three alternative remedial theories: adoption, guardianship, and custody based on his relationship sitting in loco parentis as Amber's *de facto* or psychological father. The magistrate correctly concluded that, Pat's parental rights neither having been terminated nor being sought by Dan to be terminated, adoption and guardianship were not available to him. The third alternative presents a thornier question, however. Despite Dan's counsel's able citations to authorities from other jurisdictions and eloquent arguments in support thereof, this Court is not persuaded that Idaho's statutes and case law permit step-parental custody when a natural parent is fit and willing to have custody.

Idaho Code § 32–717 vests in the courts of Idaho, before and after judgment in divorce actions, jurisdiction over the custody, care and education of 'the children of the marriage' as may seem necessary or proper in the best interests of the children. Other statutes enacted by the legislature and employing the term 'a child of the marriage' are §§ 32–704 and 32–1005, relating to the award by the court of temporary support pending a divorce action and the award of custody after the separation of the parents, respectively. Additionally, § 32–1006, I.C., provides that '[a] child born before wedlock becomes legitimate by the subsequent marriage of its parents;' and § 32–1007 gives the father and mother of a legitimate unmarried minor child equal entitlement to the child's custody, services and earnings unless either parent be dead or unable to take custody, refuses to do so, or has abandoned his or her family.

By enacting § 15–5–204 and 16–1504, the legislature has provided for placement of custody of a minor in a person not the child's parent by guardianship or adoption. A guardian may be appointed only when parental rights have been terminated or suspended by circumstances or prior court order. Adoption may take place only by consent or when parental rights have been terminated. Both statutes contemplate at least the suspension of parental rights of a living parent before a third person may be granted custody of a child.

Thus it becomes clear that the legislature intends to protect the rights of parents to custody of their children in the face of a challenge to those rights by a

third person. This intent is further clarified by the enactment of I.C. § 32–1008 which specifically gives grandparents reasonable visitation rights only upon a proper showing that the grandparents have established a substantial relationship with the child of divorcing parents.

The Idaho Supreme Court has long held that, in a custody contest between a parent and non-parent, a party to such a proceeding makes a *prima facie* case entitling him to custody merely by showing that he is a natural parent of the child. After the parent establishes a *prima facie* case, the burden shifts to the non-parent to prove that the parent has forfeited his right to custody by abandonment, or that he is unfit or unable to properly care for the child. *See, Blankenship v. Brookshier*, 91 Idaho 317, 420 P.2d 800 (1966); and cases cited therein.

Dan Stockwell, the non-parent here, *neither alleged nor proved that Pat Porter forfeited her parental rights in Amber.* The trial court properly concluded that there exists no legal basis in Idaho for an award of Amber's custody to her step-father in the absence of the forfeiture of her mother's parental rights.

Justice Drescher's consideration of that same issue had been equally thorough. Although the majority opinion does not deign to let the readers know that both judges were extremely thorough in their respective reviews, the trial bench, *i.e.*, those judges presiding in the magistrate division of the district courts, who are required to hear all of such cases, will be pleased, albeit perhaps disturbed as well, on being *now* given to further understand that Judge Drescher also was well aware of the *Ewing* case when he thoughtfully wrote out in his memorandum decision:

A third theory alleged for an award of custody is that the defendant is the de-facto parent or sits in loco parentis. To that end the defendant submits a number of cases including *Paquette v. Paquette*, 111 FLR1482 (1985), and In Re: *Ewing*, 96 Idaho 424, 529 P.2d 1296 (1974).

Those cases are distinguishable from the one at hand. In the *Paquette* case

the Vermont statute contemplated a custodial placement with the stepparent. In *Ewing*, the child had spent years with the custodian with no appreciable natural parent contact. Other cases submitted by the defendant fit a similar factual pattern.

Judge Drescher obviously so wrote only after reading *Paquette*, which is also readily found at 146 Vt. 83, 499 A.2d 23. The Vermont court in *Paquette* observed that the Vermont statute, 15 V.S.A. § 652, sets forth the guidelines governing the award of child custody in a divorce proceeding in the following language:

In an action under this chapter, the court shall make an order concerning the custody of any minor *child of the marriage*. The court shall be guided by the best interest of the child.

*Id.* § 652(a), 499 A.2d 23, 26. The Vermont court was faced with the proposition "That the term 'child of the marriage' is new to Vermont." It plowed any available ground, and arrived at the conclusion that a "child of the marriage" could include a stepfather as a parent. The case is interesting, and it is recommended reading. Of note, that court cited Idaho's *Ewing* case for the proposition of a recognized *presumption that the best interest of a child will be served by granting custody to the natural parent.* 499 A.2d at 30.

Judge Drescher, the judge on the scene, considered *Ewing* and *Paquette* in reaching his conclusion. Notably, he did not mention Idaho's *McGregor* case. To the credit of counsel representing Dan, the comprehensive brief submitted on his behalf does *not* cite to *McGregor*. Judge Drescher most likely obtained the thought that "the child had spent *years* with the custodian" from the majority opinion in *Ewing* stated that the children had *grown up* with the non-parent. On Dan's further appeal to this Court it has been noted that Judge Doolittle had first entered the stay order responsive to the perhaps overdone exhortations in Dan's ninety-page motion, affidavits and exhibits. The effect of the stay order was to leave both girls in Dan's *physical* custody. This was apparently based

on the proposition that Dan "acquired" both girls in Connecticut in August of 1986, and on his return to Idaho still possessed them, and the assertion that he would never again be able to set eyes on Danielle if she were entrusted to Patricia.

Although the majority opinion will leave its readers believing that thereafter Dan's custody of Amber was uninterrupted "for an appreciable period of time," a quick review of the record, reveals that Patricia, as of the time of oral argument, January 12, 1989, had already had physical custody of *both* Amber and Danielle on two different occasions of sixty days duration. Judge Doolittle took cognizance of her aforesaid visitation rights with Danielle in signing the stay order—with the effect that the stay order was to that extent modified. To date, while the case languishes in this Court, Patricia is still entitled to sixty days visitation per year with both girls and has been the legal custodian of Amber since February 1987. It is not known how three members of the Court can simply choose to ignore the extremely important fact that the two girls both spent sixty days with their mother in the summers of 1987 and 1988. Each time Danielle was returned to Dan. Without doubt the lower courts had in mind that such visitations "for an appreciable period of time" were in order as a continuation of the great bond which exists between a natural mother and her two daughters. One might surmise that such vital factual information is withheld from the majority opinion because otherwise it would be somewhat embarrassing to intimate that Patricia's involvement with her daughters was on a par with the extremely contrarily poor relationships said to exist in *Ewing*, which case facially appears to be the mainstay of the majority's rationale. (In *Ewing* the contest for custody involved a natural father who had not seen his two children for years—nor sent support payments—which apparently were not needed and not requested in the hopes of the father's disappearing from the scene.)

Now, as I understand the majority's opinion, we are supposed to disregard and put out of mind *three* rather important factors. *One* is that Dan's continued physical custody of both girls was *not* by reason of having been abandoned by Patricia (as in *Ewing*), but occasioned by a court stay order, violation of which would have put Patricia in an unfavorable light, if not have subjected her to contempt process. *Two* is that, other than for Judge Doolittle's stay order, Amber, whose legal custody was vested in Patricia, years ago would have been delivered to her mother's physical custody. *Three* is that counsel representing Dan was not only able to convince Judge Doolittle to enter such a drastic order, but, moreover Dan's counsel was to accomplish that without affording Patricia an opportunity to be heard in opposition to the motion—a clear violation of procedural due process and rules of the court.

What the majority does not address is on what grounds the stay was entered, and, further, whether there was a lack of procedural due process. These inquiries allude to the fact that Judge Doolittle's stay of the Judge Drescher order placing custody of Amber in Patricia ensued from an order rendered on *ex parte* application. Whereas most if not all jurisdictions hold fast to the premise that issuance of an *ex parte* order professing to award temporary custody to one parent when the other parent was not given notice of hearing is a denial of due process,[2] the majority has evaded, by avoiding, the issue of the validity of the district court's stay order, which order in essence amounted to a nullification of the Judge Drescher order placing Amber with Patricia and affirmed by Judge Doolittle. What the majority then does in that regard might by well-versed practitioners be seen as unbelievable. *In re Ewing*, 96 Idaho 424,

---

**2.** A case in point is the very recent case of *In re Marriage of Schmidt*, 436 N.W.2d 99 (Minn. 1989). The court *en banc* held that absent a finding that the effected child was in danger, a court's *ex parte* order awarding temporary custody to one parent must be set aside when the other parent was not given notice of hearing or afforded opportunity to be heard. *See e.g., Olsen v. Priest*, 564 P.2d 122 (Colo.1977); *Giddings v. Giddings*, 228 N.W.2d 915, 919 (N.D.1975) (custody modification case).

529 P.2d 1296 (1974), is said by the majority to stand for the proposition that one party's custody for an appreciable period of time (with being of no moment whether it is legal, physical, or legal and physical), should result in a child being left in the custody of that party, *even as against a natural parent.* "An appreciable time" is left wholly open-ended, and gives no guidance whatever to trial courts or litigants. Here the mother never voluntarily left custody of Amber in Dan. Never, never, never.

The majority's reliance on *Ewing* is *grossly* misplaced, and, *Ewing* was anything but a unanimous opinion. Instead of simply citing it, better that it had been reviewed by some one in the majority prior to being misused. In *Ewing* the natural mother had custody of the two minor children by virtue of a default divorce decree. She remarried and became Mrs. Gordon, thereafter dying a year after her marriage to Gordon. The two Ewing children were then but ages 6 and 3. Ewing had not paid the default-ordered child support of $100 per month, and on that basis the trial court found that Ewing had conclusively abandoned the children, notwithstanding that while the mother was living with Gordon and then married to him, Gordon was apparently supporting the family; Ewing did not interfere with that situation, other than sending the children presents once at Christmas time. The reported opinion, of great significance, does not contend that Gordon, no relation to the children, had adopted the children, or that any overtures toward an adoption were made. The legal action after the mother's death was brought by Ewing to gain custody of *his* children from Mr. Gordon. Three members

of this Court sustained the trial court's finding of a conclusive abandonment on the basis of that flimsy evidence.[3]

Whereas the majority opinion's only discussion of applicable statutory law was a reference to the definition of abandonment which is found in the Idaho Child Protective Act, and this was *not* such a proceeding, Justice Shepard proceeded immediately to the statutory law which *is* applicable in *custody* controversies, as is readily evidenced by turning to the opening paragraphs of his opinion.

I am compelled to dissent not only by reason of the result obtained in the instant case but also by reason of certain language contained in the *majority opinion,* which in my opinion *injects new criteria into an area of law* which prior to this case has at best been confusing, complex, contradictory from decision to decision and which *furnishes no guide to the courts, lawyers or the people of this state.*

Cases which present demands for custody of children are at best difficult when presented in the context of a divorce action with each of the parties demanding custody possessing natural parent status. *When such custodial demands are between* one party as a *natural parent and* the other a *non-parent* I suggest that *the decisions are demonstrably result oriented.*

One would believe that the statutes would give considerable guidance if not absolute direction in this field. I.C. § 32–1007 provides:

> The father and mother of a legitimate unmarried minor child are equally entitled to its custody, services and

**3.** It is not surprising that Justice Shepard wrote a convincing dissent, nor surprising that Justice McFadden joined it. The majority conclusion, one of the most unsubstantiated expansions to be found in the Idaho reporter system, was that *the children must not be forced into being torn away from the people with whom they have grown up.* 96 Idaho at 428, 529 P.2d 1300. That proposition would be acceptable if the two Ewing children had "grown up" or even had they come close to maturity. But far from having grown up, *they were very young children.* The majority opinion in that case in-

forms us that the natural mother died in December of 1972, which was just seven months after giving birth to a son fathered by Gordon. At her death the mother had been living with Gordon approximately thirty months, of which they had only been married nineteen months. The oldest of the Ewing children was six years of age when the mother died, and the other was barely three years old. The two Ewing children, one barely out of infancy, and the other barely ready to start school could not be fairly said to have grown up with anyone, let alone Mr. Gordon.

earnings. If either the father or mother be dead or be unable or refuse to take the custody or has abandoned his or her family, the other is entitled to the child's custody, services and earnings.

I.C. § 15-1805 prior to the adoption of the Uniform Probate Code provided:

Either the father or mother of a minor, being themselves respectively competent to transact their own business, and not otherwise unsuitable must be entitled to the guardianship of the minor.

Provisions of the Uniform Probate Code, I.C. § 15-5-104 *et. seq.* would appear to indicate the continued vitality of a parent's right to guardianship although not expressly set forth therein.

It is apparent, however, *that the court, in recent years* at least, *has done little but pay lip service to the statutes and have decided disputes between natural parents and others over custody of a child on the basis of one and/or more criteria such as abandonment of the child by the natural parent;* fitness or lack thereof of a natural parent to have custody of a child; the best interests and welfare of a child; which of the contending parties might provide a better home for the child; *the length of time that a child has been with the non-parent party and the capacity of the parent to understand the result of action resulting in relinquishment and/or abandonment. Those criteria have been changed, ignored or finessed almost yearly.*

*In re Ewing*, 96 Idaho 424, 428-29, 529 P.2d 1296, 1300-01 (1974) (emphasis supplied). Thereupon he made a most exhaustive review of Idaho cases [4] touching upon the preference to be accorded a natural parent to have custody of his or her own child as against non-parents, concluding with a

4. That review is attached hereto as Appendix A.

5. Justice Bakes did not join Justice Donaldson's *Ewing* opinion, he wrote only this much: "I concur in that portion of the opinion of Justice Donaldson concerning the trial court's finding that it is in the best interests of the children to remain with Leroy Gordon, and therefore concur in the affirmance of the judgment of the

critical review of *Yearsley v. Yearsley*, 94 Idaho 667, 496 P.2d 666 (1972), *Yearsley* being the case relied upon by the *Ewing* majority [5] for the advancement of "the child's best interest" as the favored paramount consideration:

I come now to what in my judgment is the most peculiar of all of the opinions of the court heretofore reviewed, that of *Yearsley v. Yearsley*, 94 Idaho 667, 496 P.2d 666, issued in 1972, shortly after *Duncan v. Davis* [94 Idaho 205, 485 P.2d 603 (1971)]. Therein the mother and father were divorced in 1964 when the child was one year old. Although the mother was initially granted custody of the child, shortly thereafter the father obtained custody which was confirmed by the court. The father was employed in a job that took him away from home and at that time he also had severe economic problems. He therefore placed the child with friends (Butlers) and that arrangement was confirmed by the court in 1966. The court also held at that time that neither of the natural parents were fit to have custody. The child remained with the Butlers until 1970 at which point the father brought proceedings seeking the custody of his child and alleging changed conditions since the court action of 1966. A hearing was held at which no party appeared except the father. Nevertheless, the trial court requested a recommendation from the Department of Public Assistance, which agency ·recommended that the child be left with the Butlers, albeit the report was also favorable to the father. The trial court in essence adopted the recommendation of the agency and denied the petition of the father. When the matter was heard before this court it was in the nature of a default matter with only the father appearing.

trial court." *In re Ewing*, 96 Idaho at 428, 529 P.2d at 1300. Later he would again champion the "best interests" philosophy in *McGregor v. Phillips*, 96 Idaho 779, 537 P.2d 59 (1979), discussed *infra*. But, because the Court was briefly stirred into normality by Justice Shepard's *Ewing* opinion, Justice Bakes would be a solitary dissent.

Given such a bizarre setting, it is perhaps to be understood that the opinion of this court was, to say the least, unusual in view of earlier cases discussed herein. The decision of the majority again paid lip service to the statute, I.C. § 32–1007 and also paid lip service to the earlier cases stating:

> The general rule in Idaho is that in normal situations, the natural parents are entitled to custody of the child unless it is affirmatively shown that the parent has abandoned the child or that he is unsuitable.
>
> . . . .
>
> However, this right is not absolute and is qualified. In an action such as the one at bar, the general rule will be followed unless it is affirmatively shown that both parents are *unfit to have custody*, or that *they are unable to properly maintain the child and provide for proper training and education.* (Emphasis supplied) 94 Idaho at 669, 496 P.2d at 668.

The court thereafter proceeded to base its decision on *Application of Altmiller, supra,* stating:

> In cases of this nature, three *rights* of interest are to be considered: First, that of the parents; *second, that of the person who has for years discharged all the obligations of the parents; third, and chiefly, that of the child.* (Emphasis supplied) 76 Idaho [521] at 527; 285 P.2d [1064] at 1068.

The court in further discussing *Altmiller* said:

> This Court went on to hold that while on the record both parties were fit and proper persons to have custody of the child, the party who had been in custody for almost seven years was *better fitted* to have custody of the young girl than was the father. Therefore, we cannot say that the district court acting improperly in leaving the custody of the child with the Butlers.

I suggest that there is no way in which *Yearsley* can be rationalized nor harmonized with the prior decisions of this court however confusing, complex, and contra-

dictory they may be. The majority decision in *Yearsley* appears to have ignored rights created by statute and also those criteria for determination of rights laid down in the previous cases excepting only that of *Altmiller.* I suggest that indulgence in phrases such as 'child of innocent years,' 'attachments formed in childhood,' and 'familiar scenes, friendly faces and kindly voices' do little but obfuscate the problem of a *right* of a natural parent to the custody of his child if he has not abandoned it and is otherwise a fit and proper person. The prospect of this or any other court sitting in omniscient judgment is frightening when it involves taking a child from a parent otherwise fit and proper to have custody and awarding it to another on the basis that the other can *better* provide for the child. To further confound the confusion let me add that in *Altmiller* the grandmother of the child was awarded the custody on the basis that she as a woman was naturally better fitted than the father, while in *Yearsley* the court had no hesitation in stating that the grandmother with whom the child would live along with her father was at 67 too old to share the custodial duties over a female child.

*Yearsley* becomes even more difficult to understand when the case of *Pullman v. Klingenberg,* 95 Idaho 424, 510 P.2d 488, [(1973)] decided by the court one year later is considered. *Klingenberg* involved the claim by a maternal aunt for the custody of three children aged 14 to 12 as against the claims of the natural father. The children had lived with the aunt for approximately four years and then by court order were required to live with their father for approximately five years. The children joined in the petition of the aunt. That petition of the aunt was denied by the trial court and affirmed by this court upon appeal. Both the father and the aunt were fit and proper persons to have custody of the children. The interesting aspect of *Pullman* is not only the brevity of the opinion but the fact that the court therein relied upon the statutes and cases such as

*Blankenship,* [*Nelson v.*] *Standefer,* [87 Idaho 83, 390 P.2d 838 (1964)], *Freund* [*v. English,* 83 Idaho 140, 358 P.2d 1038 (1961)], and others. Strangely missing from the court's authorities, however, are *Application of Altmiller,* and *Yearsley.*

*In re Ewing,* 96 Idaho at 431–32, 529 P.2d at 1303–04 (emphasis supplied).

Following that discussion of *Yearsley,* Justice Shepard concluded with what was clearly a denouncement of the majority's use of abandonment as a device by which a natural parent could be precluded from having custody of his own child:

> I suggest that the finding of the trial court as to abandonment in the instant case is not supported by the facts. As previously mentioned in many of the cases the fact of non-payment of support by a natural parent is not in and of itself determinative of legal abandonment or an intent to abandon. I do not find it difficult to conceive that a father of children would be highly upset and emotionally distraught knowing that his children were living in a household with his ex-wife and her paramour. While the non-payment of child support under such circumstances undoubtedly constituted contempt and disobedience of the divorce decree, nevertheless I deem it understandable and not in and of itself a conclusive demonstration of abandonment or intent to abandon his children.

*In re Ewing,* 96 Idaho at 432, 529 P.2d at 1304.

It is a rare occasion when a majority opinion is so slim in substance, and so lacking in any supporting authority that, in order to cite more than one case resort must be made to language found in a dissenting opinion. Worse yet, not just a dissent, but a one-justice dissent as against a three-justice majority. Here I allude to Justice Huntley's ingenuity in citing to and quoting from the *dissenting* opinion in *McGregor v. Phillips,* 96 Idaho 779, 537 P.2d 59. Ingenuity is an applicable noun because, putting aside for now whatever may have induced Justice Huntley into taking the course he has cho-

sen, he for certain was able to thereby fetch Justice Bakes into his camp. As noted earlier, Justice Bakes, although he did not join Justice Donaldson's opinion, did take the opportunity to separately write his endorsement of the "child's best interest" philosophy. Undoubtedly Justice Bakes was disappointed when, in the *McGregor* custody challenge between a natural mother and a non-parent, the Court judicially took its cue from Justice Shepard's stirring and educational treatise found in *Ewing.* The non-parent's contention was that the trial court erred in concluding that the mother had not abandoned her child, and in finding that the welfare and best interests of the child dictated an award of custody to the natural mother. This Court's response was to repeat only this wee bit from *Ewing* that:

> *The long standing rule* in Idaho is that the welfare of the child is of primary consideration in determining custody rights in children. In the implementation of this rule, *this Court has consistently applied the presumption that a natural parent should have custody of his child* as opposed to other lineal or collateral relatives or interested parties.

*McGregor,* 96 Idaho at 780, 537 P.2d at 60. The opinion for the Court, authored by Justice McQuade and joined by Justices McFadden, Donaldson, and Shepard, pointed to the trial court's (The Honorable Edward J. Lodge) conclusion of law number V, "That it is in the best interest of said minor child that her physical custody temporarily remain in the Respondents and that said physical custody be transferred to the Petitioner over the course of a transitional period . . ." and declared that it "was based upon substantial and competent evidence and correctly applied the law." *McGregor,* 96 Idaho at 781, 537 P.2d at 61. Thus the appeal was disposed of—albeit in a manner not to the satisfaction of Justice Bakes, who would dissent notwithstanding that it had become readily apparent that the welfare of the child and the child's best interests are wholly equivalent synonyms.

The *Ewing* opinion was issued on December 26, 1974, and it was available to counsel and the trial court when it decided the

*McGregor* case, which determined that the mother had not abandoned her child by leaving the child with the paternal grandmother (non-parent). 96 Idaho at 780, 537 P.2d at 60. In short, the trial court, and in turn this Court, both acknowledged the existence of the *Ewing* majority opinion, but did not follow it. This Court's opinion in *McGregor* utilized *Ewing* only for prefatory remarks setting out the long standing rule which in *Ewing* had also been prefatorily set out, and was credited to the *Yearsley* case,[6] which in turn had been taken from *Blankenship v. Brookshier,*[7] *ad infinitum.* All of those cases were painstakingly reviewed by Justice Shepard in his *Ewing* opinion (Appendix A, attached). The point being made is that when *McGregor* followed on the heels of *Ewing*, the Court returned to the position espoused by Justice Shepard—but, in doing so, failed to overrule or distinguish *McGregor* from *Ewing.* This in turn made the prophetic remarks of Justice Shepard in *Ewing* come true, when he said of *Yearsley:*

> The majority decision in *Yearsley* appears to have ignored rights created by statute and also those criteria for determination of rights laid down in the previous cases excepting only that of *Altmiller.* I suggest that indulgence in phrases such as 'child of innocent years,' 'attachments formed in childhood,' and 'familiar scenes, friendly faces and kindly voices' do little but obfuscate the problem of a *right* of a natural parent to the custody of his child if he has not abandoned it and is otherwise a fit and proper person. *The prospect of this or any other court sitting in omniscient judgment is frightening when it involves taking a child from a parent otherwise fit and proper to have custody and awarding it to another on the basis that the other can better provide for the child.*

*Ewing*, 96 Idaho at 431–432, 529 P.2d at 1303–04.

Today the Court flip-flops by now ignoring *McGregor*, and returning to *Ewing*,

boldly stating that both Judge Drescher and Judge Doolittle erred in not paying heed to the "best interests" of the children. Having done that injustice to the handiwork of two dedicated jurists, the conclusion is drawn that it is necessary to further prolong this litigation with the intervention of a mediator who will somehow be able to bring the parties together or, perhaps, to omnisciently advise the courts below where the best interests of the children lie.

One cannot help but compare the lack of progress of this case against the alacrity with which the *McGregor* case sailed through the system. There the initial petition of the natural mother was filed on April 15, 1974; the answer of the non-parent was filed two weeks later; trial was had and the judgment entered awarding custody to the mother on August 15, 1974. The non-parent's appeal was timely filed, as were the briefs. Shortly after oral argument this Court's opinion issued on June 4, 1975. The controversy would have been over, other than for Justice Bakes' dissent which invited the non-parents to file a petition for rehearing. Parroting that which Justice Bakes had written, the non-parent asserted that this Court had paid no attention to the "child's best interests." This said Justice Bakes, and so said the petition, notwithstanding that this Court's opinion upheld the trial court's conclusion specifically utilizing "best interest" language. 96 Idaho at 781, 537 P.2d at 61.

Justice Bakes disagreed that the trial judge had done so, or at least that he did so correctly. This was based on his *appellate fact-finding* view that *"the non-parental party has introduced sufficient evidence to rebut the presumption"* which he recognized as the established "presumption that the natural parent should have custody of the child as opposed to other relatives or interested parties." 96 Idaho at 782, 537 P.2d at 62 (Bakes, J. dissenting). Had his views carried the day, that litigation would have been prolonged by reversing the custody order and remanding so that "the trial court must weigh the evidence presented

---

6. *Yearsley v. Yearsley,* 94 Idaho 667, 496 P.2d 666 (1972).

7. *Blankenship v. Brookshier,* 91 Idaho 317, 420 P.2d 800 (1966).

and decide the case, *not on the basis of any presumption,* but on whether or not a change in the actual custody is in the best interests of the child." 96 Idaho at 782, 537 P.2d at 62 (Bakes, J. dissenting). His views, however, did not carry the day. The petition for rehearing was denied July 24, 1975, and the litigation brought to a conclusion.

It is inexplicable that now, fourteen years later, in reaching a decision to prolong this *Stockwell* litigation, three members of this Court, including Justice Bakes, purport to justify doing so on the basis of a partial quote of that which Justice Bakes wrote ineffectively in 1975, in a solitary dissent, and at the same time the three justices give no regard to the majority opinion in *McGregor,* or to the underlying opinion of its author, Judge Lodge. Justice Bakes wrote in *McGregor:*

> But *where,* as in this case, *the parent has turned the child over to its grandparents when she was just an infant, and the grandparents are really the only parents which the child has ever known, and where the mother is a stranger to the child* as the petitioner is in this case, ...

96 Idaho at 782, 537 P.2d at 62 (Bakes, J., dissenting) (emphasis supplied.) One need not pause to quarrel with those opening words. To read them, however, is to put *McGregor* aside. In Amber's case her mother did not turn Amber over to anyone. No one, prior to today, has been so elastic in conscience as to intimate that Amber's mother has abandoned her. It is not even an issue. The majority's citation to *Ewing* does not add any substance to its opinion. It is naught but a sham. *McGregor* is thrown out solely so that the majority is able to cite two cases, rather than one, for the majority to postulate as *"clearly established Idaho precedent,"* that "Dan's essentially sole custody for the past two and one-half years" and his "longstanding substantial custodial and parental relationship ... with Amber" obligated the lower courts "under settled Idaho law to consider Amber's best interests in determining who should be entrusted with her custody." I find this declaration of "settled Idaho law" to be pure hogwash, totally unsupported, and not applicable to the facts of this case.

Plain and simple, *Ewing* was a case where the court inconceivably upheld a lower court conclusion that the father had abandoned his two children by allowing them to be in the care and custody of his former wife (their mother) and her new husband until she died when one child was but a toddler and the other barely six years of age, with the majority in that case at the same time stating that the children had grown up with the non-parent. It was wrongly decided. The views of Justice Shepard and Justice McFadden clearly should have prevailed and thereafter did in the *McGregor* case. In short, and as Justice Shepard made clear, *Ewing* was an aberration; it was result-oriented. Today's opinion is of the same ilk, only worse, because it legislates into existence mediation—clearly another judicial interference with the legislative prerogative.

The record does not justify the majority in saying of the two judges who have presided over this case that both erred in failing to consider the best interests of the two Stockwell girls. This case will fall into that group of cases which Judge Shepard identified in his *Ewing* review, namely where the Court reached a decision as to which way it wanted to go, and did so. Here it is all too obvious that three members of the Court at some time and some place unknown decided to use this case as a stepping stone to bring court-ordered mediation into custody controversies. Frankly, I am disappointed and dismayed at such tactics. In doing so, they render a disservice to the litigants; they make even more unstable the precedential case law which should instead be giving sure-footed and even-handed guidance to the trial bench and bar.[8] The decisions of Judge Drescher and Judge Doolittle should be affirmed.

---

8. Justice Shepard, in addition to his *Ewing* dissent, also made a similar attempt to steer the Court in the right direction in the *Yearsley* case. There, too, he was joined by Justice McFadden.

Justice Bakes did not sit in *Yearsley.* The third member of the majority was District Judge Maynard, sitting *pro tem.*

An affirmance would make it unnecessary to discuss the validity of the stay order, which as earlier stated, is not addressed at all by the majority. Obviously a temporary order obtained without notice, it should have been ruled invalid and rescinded or set aside, Instead of questioning the grant of such an ex parte order, Justice Johnson out of the blue showed an uncommonly keen interest in mediation, a subject which to my knowledge has never before come up for discussion by the Court. Mr. Buser representing Dan, the appellant, had just occupied the podium to make his final argument when the following took place:

> JUSTICE JOHNSON: Mr. Buser, before you begin, I'm going to throw a monkey wrench in here and ask you a question off the wall, based on the dialogue that just occurred between the Chief and Mr. Williams. Do you think this Court has authority in its disposition of the case to require mediation?
>
> [Fifteen second pause]
>
> MR. BUSER: Of this Court to instruct the trial court?
>
> JUSTICE JOHNSON: Yes.
>
> MR. BUSER: Yes, I do.
>
> JUSTICE JOHNSON: All right.

In order to invoke the mediation procedure it was necessary to reverse not one but two judges, namely Judge Drescher who had to resolve the custody issue in the first place, and in turn Judge Doolittle who reviewed the record and affirmed Judge Drescher. Had this Court in turn affirmed their decisions, the litigation would have come to a proper and well-deserved conclusion.

But, the monkey wrench was thrown in, and now there is also thrown at these parties, Dan and Patricia, and the two teenage daughters as well, the prospect of being the first guinea pigs to have the experience of mediation thrust into their lives. It is without doubt as wrong as anything which this Court has ever done. The custody controversy has been thoroughly litigated by the parties in the forum which the legislature created for the resolution of such disputes, namely the state judicial system. Even before statehood the territorial legislature vested the district courts with "Exclusive original jurisdiction of all actions and proceedings to ... make all necessary orders for the custody of children." Rev. Stat.1887, § 2483. Specifically the legislature provided that in divorce actions the district court would "give such direction for the custody, care and education of the children of the marriage as may seem necessary or proper, and may at any time vacate or modify the same." Rev.Stat. § 2473. Today, over a hundred years later the district courts continue to have that exclusive jurisdiction over child custody issues. I.C. §§ 37–715, 32–717. One slight change is that district courts now have magistrate divisions of district courts, and the judges of such divisions are ordinarily the initial decision makers, with there being a right of first appeal to a district judge, who may decide to rehear the issue at a trial *de novo*, or to sit in an appellate capacity. Further review of proceedings below is by appeal to this Supreme Court which may decide the issues, or assign the case to the Court of Appeals.

In sum, the litigants, the trial bench, the trial bar, and the citizenry of Idaho behold this day what is commonly known as judicial activism, in one of its most questionable aspects. The word "mediation" nowhere appears in Title 32 of the Idaho Code, captioned Domestic Relations, various sections of which are devoted to child custody. One day "mediation" very well may be found in the Idaho Code. For one, I hold no belief against mediation. But I do recognize that mediation will come about, if it does, by reason of legislative enactment, not by reason of judicial tinkering and usurpation of legislative powers. The Court goes way too far this day in occupying a field which belongs to the legislature. That it previously did so in assuming its right to make substantive (as against procedural) rules of evidence does not create justification. Two wrongs simply do not make a right. In usurping the legislative prerogative the Court, unlike the legislature, has no grass-roots connections with the people of Idaho. The legislature, by contrast, has representatives and sena-

tors from all over the state, and can and does truly represent its constituents.

It very well may be that the people of this state for all the years of statehood and extending back into territorial days, have been content to have their district judge assume and discharge the obligation of resolving custody controversies. Moreover, the taxpayers of this state pay out good money to those judges for fulfilling that function.

Who, under today's judicial fiat, is going to be responsible for paying the mediator which Judge Drescher is ordered to retain? Perhaps the bill should be sent to Justices Johnson, Bakes, and Huntley.

Another problem here, and no small one, is the injustice of sending out such an order to Judge Drescher. Neither of the parties in briefing submitted to the Court made any such suggestion, or raised any such issue.

For many years now, in fact as long as the law has been my profession, I have been given to understand that the Court never *sua sponte* makes a decision on a point which has not been addressed by the parties. Heretofore, when the Court itself has been inclined to see an issue or a proposition, or a remedy not addressed by the parties, it has shown the consideration of calling attention to the same, and asking counsel to submit briefs. In *State v. Cariaga*,[9] where the Court was inclined to rule in favor of a defendant convicted of prostitution, on the basis that she had been convicted of a crime not charged in the complaint, the Court apparently ordered the defendant to file a supplemental brief during oral argument. In that supplemental brief the defendant raised the issue. In *State v. Otto*, 102 Idaho 250, 629 P.2d 646 (1981), the defendant appealed from a conviction of attempted first degree murder, this Court reversed on the basis that solicitation of a person to commit a murder did not amount to an attempt, a decision with which I did not agree. But I did agree with the propriety of the Court advising the defendant and the state that the Court has *sua sponte* raised that issue which able

defense counsel had not, and both parties briefed and argued the point *before the Court* reached its decision. *State v. Otto*, 102 Idaho at 258 n. 2, 629 P.2d at 654 (Bistline, J. dissenting).

One would like to know why, when the majority *sua sponte* in this case decided to go on a mediation trip, it did not extend to counsel for the parties the same courtesies, and right to participate and be heard, as were extended to convicted criminal defendants in *Cariaga* and in *Otto*. Is the issue of child custody of less importance?

### APPENDIX A

I suggest that a review of only a few of the more recent cases disclose the oft contradictory opinions of this Court. In *Nelson v. Standefer*, 87 Idaho 83, 390 P.2d 838 (1964) the court had little difficulty in affirming a trial court's award of the custody of a minor child to the maternal grandparents over the claim of the natural mother of a child. The court said therein:

> As a general rule, parents have natural and legal right to the custody of their minor children. When such relationship is established a prima facie case has been made and the burden is then upon the other party to overcome such prima facie case by showing that the natural parent or parents *have forfeited such right*, or at least that such parent or parents *are not fit and proper persons to have custody*. (Emphasis supplied)

The court therein affirmed the finding of the trial court that the mother of the child was not a fit or proper person to have custody on the basis of her repeated immorality, her neglect of the child's physical well being and acts of cruelty toward the child by the stepfather.

Just short years before, the court in *Application of Altmiller*, 76 Idaho 521, 285 P.2d 1064 (1955), had reversed a trial court determination and awarded custody to a grandmother over the protests of the natural parent of the child. The court therein affirmed the finding of the trial court that

---

**9.** 95 Idaho 900, 523 P.2d 32 (1974) (before my time on the Court).

there had been no abandonment of the child by its father and stated:

> Non-support and abandonment are not synonymous. Non-support, in and of itself, does not constitute abandonment.

The court also affirmed the finding of the trial court that the father was a fit and proper person to have custody of his child stating:

> Although it is undisputed that the respondent is morally a fit and proper person to have the care, custody and control of his minor daughter, Nancy, it is disputed whether or not he has a suitable and proper place to care for and educate her. 76 Idaho at 525, 285 P.2d at 1067.
>
> . . . .
>
> While under the record both parties to this action are fit and proper persons t have custody of the child, *material advantages are presented for the child* to remain where she is, and in our opinion she will be reared, trained and cared for best by a woman—in this case the appellant—rather than the father, as he is unable to properly care for a young girl. (Emphasis supplied) 76 Idaho at 527, 285 P.2d at 1068.

The child in that case was eleven years old at the time of the decision and had lived with her grandmother since she was four years old.

In 1961 in *Freund v. English,* 83 Idaho 140, 358 P.2d 1038 (1961), the court affirmed the decision of the trial court awarding the custody of the child to the natural father over the claims of the grandparents who had had the custody of the seven year old child since he was two. The court therein relied upon the statute stating:

> The right of a parent to the care, custody and control of his child is a natural right and the law applicable in proceedings of this nature is well settled in this state. Citing I.C. § 32–1007. 83 Idaho at 144–145, 358 P.2d at 1041.
>
> . . . .
>
> Although the welfare of the child controls over the general right created by laws of this character, in a proceeding to obtain custody of a child from a natural

parent, the burden is upon the party seeking such custody *to prove abandonment or a forfeiture of the parent's right or that the parent is unfit or unable to properly care for the child.* (Emphasis supplied) 83 Idaho at 145, 358 P.2d at 1041.

In 1965 in *Spaulding v. Children's Home Finding and Aid Society,* 89 Idaho 10, 402 P.2d 52, the court citing I.C. § 32–1007 and I.C. § 15–1805, returned a child to its natural parent stating "[i]f the parent is competent to transact his or her own business, and is not otherwise unsuitable, the custody of the child is not to be given to another *even though such other may be a more suitable person.*"

In 1966, the court in *Clark v. Jelinek,* 90 Idaho 592, 414 P.2d 892, over a strong dissent, awarded the custody of the children to a stepfather rather than the natural father of the children. Although not expressly disclosed by the opinion it is apparent that the children were not more than five years old at the time of the initiation of the writ of habeas corpus by their father and had lived with their mother and stepfather two years prior to the death of their mother. The court noted the statutes indicating that natural parents have the absolute legal right to the custody of their minor children but noted that:

> [T]he prima facie right of the parent to custody may be defeated by competent proof that the natural parent has forfeited or abandoned his right or that the parent is not a fit and proper person to have custody of the child.

Although the dissent vociferously disagreed, the majority opinion found that the natural father had abandoned his child primarily because he had not paid support for nine months. (The dissent contended that the father had no knowledge of the whereabouts of the family and therefore was unable to pay the child support.)

In 1966 a unanimous court decided the case of *Blankenship v. Brookshier,* 91 Idaho 317, 420 P.2d 800. The subject of that proceeding was a minor child ten years of age who had lived practically all of his life with his grandparents. The natural father had paid $35 per month in child support

payments during the first four years of the child's life but thereafter had made no payments. The court recognized and cited the hereinabove noted legislation and stated:

> After respondent established a prima facie case, (that he was the natural parent) the burden shifted to appellants to prove that respondent *forfeited* his parental rights by *abandonment,* or that he was *unfit* or *unable properly to care for the child.*
>
> . . . .
>
> Respondent's continuing interest in his son's welfare demonstrates that at no time did he intend to abandon or desert his child to appellant's custody.

It was stipulated that the grandparents were fit and proper competent people to have the custody of the child should the court grant them that right. On the other hand, the father had been involved in minor criminal proceedings, was a seasonally employed logger, drawing three months unemployment compensation each year, who with his wife and their five children lived in a 2–bedroom former lumber yard office. The court however dealt with that problem by stating:

> The court is concerned with the fitness of the natural parent at the time of the hearing as it relates to the welfare of the child. If the parent is, at the time the question arises, a suitable person to have custody of the child, the court will not deny custody merely because at some time in the past the parent's conduct indicated a lack of integrity or responsibility. 91 Idaho at 321, 420 P.2d at 804.

In 1971 the court in the case of *Duncan v. Davis,* 94 Idaho 205, 485 P.2d 603, in effect, reclaimed a child from foster and prospective adoptive parents and awarded the child to the natural mother. Therein the court affirmed the decision of the trial court finding that when the natural mother of the child had relinquished it for adoption she was not aware of the consequences flowing from that action. In the context of this case, *Duncan v. Davis, supra,* is perhaps only interesting in that nowhere therein did that court discuss any of the criteria regarding fitness of the parties, welfare of the child, or abandonment.

Mercifully this discussion (or tirade, depending upon your point of view) draws to a close. I believe it is past time for this court to face up to the difficult problems which confront it in this particular field of law and lay down criteria for the guidance of the trial courts, the lawyers and the people of this state. The case at bar is demonstrative of the impossibility of reconciling previous decisions of the court and whether the statutes of the state have any controlling influence or whether they are to be merely cited and thereafter ignored.

*In re Ewing,* 96 Idaho 424, 429–432, 529 P.2d 1296, 1301–1304 (1974).