IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 47710

| | |
|---|---|
| LINSAY LORINE GATSBY,<br>nka LINSAY LORINE WALLACE,<br><br>  Petitioner-Appellant,<br><br>v.<br><br>KYLEE DIANE GATSBY,<br><br>  Respondent. | Boise, December 2020 Term<br><br>Opinion filed: September 24, 2021<br><br>Melanie Gagnepain, Clerk |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Gerald F. Schroeder, Senior District Judge. Diane M. Walker, Magistrate Judge.

The decision of the district court is <u>affirmed</u>.

Idaho Legal Aid Services, Inc., Boise, for Appellant. Howard Belodoff argued.

Michael Doolittle, PC, Boise, for Respondent. Michael Doolittle argued.

_____

MOELLER, Justice.

We have before us an appeal in a custody case brought by a woman whose same-sex former spouse conceived a child through artificial insemination during their marriage. This appeal asks us to reexamine Idaho law pertaining to artificial insemination, paternity, and parental rights in light of the U.S. Supreme Court's ruling in *Obergefell v. Hodges*, 576 U.S. 644, 647 (2015).

The district court affirmed the magistrate court's ruling that Appellant Linsay Gatsby ("Linsay") had no parental rights to the child under Idaho's common law marital presumption of paternity because she conceded that she lacked a biological relationship with the child. The district court also affirmed that Linsay had no parental rights under the Artificial Insemination Act because she did not comply with the statute's provisions. The district court further ruled that Linsay would have had parental rights if she had filed a voluntary acknowledgment of paternity or adopted the child, but she did not do so. Finally, the district court affirmed that Linsay did not have third party

1

standing to seek custody and, in the alternative, that custody or visitation would not be in the child's best interest if Linsay did have third party standing. For the reasons set forth below, we affirm the decision of the district court.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Linsay and Kylee Gatsby married in June 2015. They later decided Kylee would attempt to conceive a child through artificial insemination, using semen donated by a mutual friend. They elected to attempt this procedure on their own, without using the services of a physician. Additionally, without consulting an attorney, Linsay, Kylee, and the semen donor signed an artificial insemination agreement Linsay found online, listing the friend as "donor" and both Linsay and Kylee as the "recipient." The agreement included acknowledgements that the recipient intended to become pregnant and to have rights to the child, and that the donor would not have parental rights or obligations to the child. Linsay performed the insemination procedure on Kylee in their home. After several attempts, Kylee became pregnant. On October 29, 2016, Kylee gave birth to the child.[1] It is undisputed that Kylee is the child's biological mother. Linsay was present at the birth. The birth certificate worksheet, which Kylee signed, designates Kylee as "mother," and the word "father" on the form is crossed out and "mother" written by hand in its place to also identify Linsay as the child's mother. The Idaho Department of Health and Welfare issued a Certificate of Live Birth identifying both Kylee and Linsay as the child's mothers. The child resided with Linsay and Kylee, who held themselves out as the child's parents. Both Kylee and Linsay shared in caregiving, but Kylee was the child's primary caregiver.

The following summer the couple had an argument. Both Linsay and Kylee had been drinking, and Kylee became drunk. Kylee shoved Linsay off a bed. Then Linsay punched Kylee, breaking her nose. The child was in the bedroom during the fight, and Linsay's two children from a prior relationship were also in the home. Kylee was arrested and subsequently pleaded guilty to domestic battery, a misdemeanor. Kylee had also committed an act of domestic violence years earlier. On July 5, 2017, a No Contact Order ("NCO") was issued, which prohibited Kylee from seeing the child except at daycare. On August 29, 2017, Linsay filed for divorce. Kylee filed an Answer and Counterclaim, asserting that Linsay had "no legal claim or standing to any custody or visitation" to the minor child.

---

[1] Although identified by initials in the proceedings below, due to privacy concerns, we will refer to the child at issue in this proceeding simply as "the child."

2

Due to the NCO, Linsay had sole custody of the child from Kylee's arrest on July 3, 2017, until December 27, 2017, when the magistrate court issued a Temporary Order giving Kylee and Linsay equal custody. In the meantime, Kylee had successfully participated in a Domestic Violence Offender Intervention/Treatment class. After sharing custody for nearly one year, on November 15, 2018, the magistrate court granted sole custody of the child to Kylee. The magistrate court found that Linsay was not the child's legal parent, Linsay had established no third-party rights, and, in the alternative, it was not in the child's best interest for the court to award Linsay custody or visitation rights as a third party based on the evidence in the record.

Regarding Kylee's rights to custody, the magistrate court found "Kylee is the natural, biological parent of [the child]. Therefore, Kylee has a fundamental constitutional and statutory right to the custody, care, and control of [the child]." Regarding Linsay's rights to custody, the magistrate stated:

> A rebuttable presumption exists that Linsay is [the child's] parent due to the parties being married when [the child] was born. *Alber v. Alber*, 93 Idaho 755, 760-61, 472 P.2d 321, 326-27 (1970). The presumption may be overcome by clear and convincing evidence. *Id.* The parties agree that Linsay is not [the child's] biological parent. The parties agree that [the child's] biological parents are Kylee and [the semen donor]. The marriage presumption of parentage of a child born during the marriage has been overcome by clear and convincing evidence that Linsay is not [the child's] parent.

> Linsay is not a legal parent through other legal avenues due to her failure to utilize legal proceedings to declare her a parent. Linsay did not sign or properly file a voluntary acknowledgment of paternity affidavit pursuant to Idaho Code § 7-1106. Had Linsay done so, she would have been declared a legal parent. Linsay did not adopt [the child] pursuant to Idaho Code § 16-1501 *et seq.* Had Linsay done so, she would have been a legal parent. Linsay did not comply with the Artificial Insemination Act and cannot receive the benefit. Linsay did not sign or file a consent form pursuant to Idaho Code § 39-5403. Had Linsay done so, she would have been a legal parent. Linsay does not get the benefit of the law that she did not invoke and follow.

> In this case, Kylee is the natural, biological parent of [the child]. Therefore, Kylee has a fundamental constitutional and statutory right to the custody, care, and control of [the child].

Further, the magistrate court found Linsay had no grounds as a third party to seek custody or visitation rights. In the alternative, the magistrate found that it was not in the child's best interest to award custody or visitation rights to Linsay as a third party. Among the magistrate's factual findings were the following: that the child had bonded with both Linsay and Kylee; that both

3

sought sole custody in vengeance against the other; that neither was able to control the conflict with the other for the child's sake; that Linsay prioritized her own needs over those of the child; and that "both parties have character flaws that negatively affect them for parenthood." The magistrate court found that Linsay had been dishonest and perjured herself during her trial testimony, and concluded that Kylee's interpersonal relationships were more stable than Linsay's.

Linsay filed a Notice of Appeal, and the district court affirmed the magistrate court's decisions. Linsay now appeals to this Court.

## II.     STANDARD OF REVIEW

When the Idaho Supreme Court reviews the decision of a district court sitting in its capacity as an appellate court, it applies the following standard of review:

> The Supreme Court reviews the trial court (magistrate) record to determine whether there is substantial and competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings. If those findings are so supported and the conclusions follow therefrom and if the district court affirmed the magistrate's decision, we affirm the district court's decision as a matter of procedure. Thus, this Court does not review the decision of the magistrate court. Rather, we are procedurally bound to affirm or reverse the decisions of the district court.

*Papin v. Papin*, 166 Idaho 9, 454 P.3d 1092, 1101 (2019) (internal quotations omitted).

"Child custody determinations involving minor children are left to the sound discretion of the trial court, and will not be overturned on appeal absent an abuse of discretion." *Hopper v. Hopper*, 144 Idaho 624, 626, 167 P.3d 761, 763 (2007). The relevant inquiry upon review is whether the trial court "(1) correctly perceived the issue as one of discretion; (2) acted within the boundaries of such discretion; (3) acted consistently with any legal standards applicable to the specific choices before it; and (4) reached its decision by an exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018). Findings of fact in a court-tried case are to be liberally construed in favor of the judgment and will be upheld if supported by substantial and competent evidence. *Hopper*, 144 Idaho at 626, 167 P.3d at 763.

Notwithstanding the broad discretion granted to the magistrate judge in a custody dispute, this Court exercises free review over questions of law, *id.*, including constitutional questions and questions of statutory interpretation. *Leavitt v. Craven*, 154 Idaho 661, 665, 302 P.3d 1, 5 (2012). In cases regarding the constitutionality of a statute:

> There is a presumption in favor of the constitutionality of the challenged statute or regulation, and the burden of establishing that the statute or regulation is

4

unconstitutional rests upon the challengers. An appellate court is obligated to seek an interpretation of a statute that upholds it [sic] constitutionality. The judicial power to declare legislative action unconstitutional should be exercised only in clear cases.

*Id.* (quoting *Stuart v. State,* 149 Idaho at 40, 232 P.3d at 818 (citations omitted)).

## III. ANALYSIS

This case deals with the sensitive issue of artificial insemination and the rights of spouses who are non-biological parents to children conceived through artificial insemination using a third-party semen donor. Although the issue in this case comes to us in the context of a same-sex marriage, it would be an issue of first impression regardless of the genders of the spouses.

**A. The district court did not err in concluding that Linsay does not have parental rights to the child.**

**1. The Artificial Insemination Act is the controlling statute in this case.**

As a threshold matter, we must first hold that the Artificial Insemination Act (I.C. §§ 39-5401 – 39-5407) ("AIA") is the controlling statute in this case. We acknowledge that there has long been a common law marital presumption of paternity in Idaho. *See Alber v. Alber*, 93 Idaho 755, 760–61, 472 P.2d 321, 326–27 (1970) ("We hold that where, as here, a child is admittedly conceived during the period of a marriage . . . a [rebuttable] presumption arises that the then husband is the father of the child."). Additionally, the legislature adopted the Paternity Act, Idaho Code section 7-1101, et seq., in 1969 to address various paternity issues. *See* I.C. § 7-1102 ("The district courts shall have exclusive original jurisdiction in proceedings to establish paternity and, in any such proceeding in which it makes a finding of paternity, to order support and determine custody, as set forth in this act."). Nevertheless, the legislature adopted the AIA in 1982 to specifically address issues that are unique to artificial insemination—including "[t]he relationship, rights and obligation between a child born as a result of artificial insemination and the mother's husband . . . ."). I.C. § 39-5405(3). Importantly, the AIA was enacted after this Court decided *Alber* and after the legislature adopted the Paternity Act.

This Court has long held that "the legislature clearly has the power to abolish or modify common law rights and remedies." *Olsen v. J.A. Freeman Co.*, 117 Idaho 706, 717, 791 P.2d 1285, 1296 (1990) (citing *Jones v. State Bd. of Medicine*, 97 Idaho 859, 555 P.2d 399 (1976)). "In addition, where two statutes conflict, courts should apply the more recent and more specifically applicable statute." *Eller v. Idaho State Police*, 165 Idaho 147, 154, 443 P.3d 161, 168 (2019)

5

(citing *Valiant Idaho, LLC v. JV L.L.C.*, 164 Idaho 280, 289, 429 P.3d 168, 177 (2018)). Therefore, because the AIA followed *Alber* and the Paternity Act, and because the AIA is the more specific statute and has provisions that address how parental rights are established, we conclude that the AIA is controlling with respect to the case at bar. Therefore, neither the common law marital presumption of paternity nor the Paternity Act should be applied to resolve this case. In fact, the application of either would undermine the consent and recording requirements of the AIA.

While the lower courts analyzed this case under the marital presumption and the Paternity Act, in addition to the AIA, the real issue presented in this case can be resolved by the AIA alone. Thus, the question presented is simple: did Linsay comply with the provisions of the AIA? The record fully supports the finding of the magistrate court that she failed to comply with consent and recording requirements set forth in the AIA.

The AIA expressly states: "Artificial insemination shall not be performed upon a woman without her prior written request and consent and the prior written request and consent of her husband." I.C. § 39-5403(1). Further, the AIA provides that a child and husband will have the same legal relationship as a child naturally conceived if the husband consented to the performance of the artificial insemination:

> (1) The donor shall have no right, obligation or interest with respect to a child born as a result of the artificial insemination.
>
> (2) A child born as a result of the artificial insemination shall have no right, obligation or interest with respect to such donor.
>
> (3) The relationship, rights and obligation between a child born as a result of artificial insemination and the mother's husband shall be the same for all legal intents and purposes as if the child had been naturally and legitimately conceived by the mother and the mother's husband, *if the husband consented to the performance of artificial insemination*.

I.C. § 39-5405(1)–(3) (emphasis added). *See Doe v. Doe*, 162 Idaho 254, 258, 395 P.3d 1287, 1291 (2017) (Under Idaho Code section 39-5405, "[i]f the mother is married, *and the husband has consented to artificial insemination*, then the husband and resulting child have the same rights and obligations with respect to each other as if the child had been conceived naturally by the mother and husband.") (emphasis added).

The AIA goes on to require the filing of the request and consent with the state registrar of vital statistics:

> (2) Whenever a child is born who may have been conceived by artificial insemination, a copy of the request and consent required under subsection (1) of

6

this section shall be filed by the physician who performs the artificial insemination with the state registrar of vital statistics. The state board of health and welfare shall have the authority to promulgate rules and regulations and to prescribe methods and forms of reporting, and fees to carry out the provisions of this act. Storage, retrieval and confidentiality of records shall be governed by chapter 1, title 74, Idaho Code.

I.C. § 39-5403(2). The remaining sections of the AIA address regulations that promote health and safety. For example, Section 39-5402 provides that "[o]nly physicians licensed under chapter 18, title 54, Idaho Code, and persons under their supervision may select artificial insemination donors and perform artificial insemination." Sections 39-5404 and 39-5407 set standards on donors for health and safety purposes.

Under *Obergefell v. Hodges*, 576 U.S. 644 (2015), the AIA must be read in a gender-neutral manner. When read in that manner, there is no equal protection concern because the AIA would apply to opposite-sex couples and same-sex couples in the exact same manner. Admittedly, the AIA uses terms like "mother" and "mother's husband." While the legislature may not have foreseen in 1982 that a mother's spouse would not always be her "husband," we are required to interpret statutes in a manner that upholds their constitutionality whenever possible. *See Leavitt*, 154 Idaho at 665, 302 P.3d at 5. Furthermore, in 2010, the legislature clarified the definition of gender terms as used in its statutes: "Unless otherwise defined for purposes of a specific statute: … [w]ords used in the masculine gender, include the feminine and neuter . . . ." I.C. § 73-114(1)(b). Thus, in interpreting section 39-5405(3) of the AIA, we can freely substitute "spouse" for "husband." The district court relied on Idaho Code section 73-114(1)(b) to read the AIA in a gender-neutral manner. We affirm that section 73-114(1)(b) permits reviewing courts to read the word "husband" in the AIA as the gender-neutral term "spouse." Therefore, we will read the AIA accordingly and affirm that it was applicable and available to Linsay to secure parental rights to the child, had she complied with its terms. In sum, this means that while Linsay is entitled to the same legal rights as a male spouse, she is also subject to the same legal requirements.

### 2. The parties did not comply with the Artificial Insemination Act.

At the time the child in this case was conceived, consistent with the directive in section 39-5403 to "promulgate rules and regulations and to prescribe methods and forms of reporting," the Department of Health and Welfare required the use and filing of a specific "Request and Consent for Artificial Insemination" form, which can also be read in a gender-neutral manner:

### 900. REQUESTS AND CONSENT FOR ARTIFICIAL INSEMINATION.

7

**01. Form Content.** The form for reporting the birth of a child who may have been conceived by artificial insemination shall be known as "Request and Consent for Artificial Insemination." The form shall be signed and dated by the wife, husband, and the physician who participates in the procedure of artificial insemination. The form shall include the statement:

"The undersigned husband and wife do hereby consent of their own free will and choice to said artificial insemination.

The undersigned have been advised of, and understand the provisions of Title 39, Chapter 54, Idaho Code, including, but not limited to, the provision that if the physician who performs the artificial insemination does not deliver the child conceived as a result of the artificial insemination, it is the duty of the mother and her husband to give that physician notice of the child's birth. We do hereby agree to be bound by such provision.

Dated this day of          20__."

**02. Filing of the Form.** Within fifteen (15) days of the birth of the child who may have been conceived by artificial insemination, or within fifteen (15) days of receiving notice of the birth of such child, the physician who performed the artificial insemination will file the original copy of the "Request and Consent for Artificial Insemination" form with the State Registrar of Vital Statistics.

IDAPA 16.02.08.900 (repealed 2019).

The magistrate found that Linsay did not "register[] a written consent agreement as contemplated by the Artificial Insemination Act," which prevented her from benefiting from the law. The district court observed further that, contrary to the statute, Linsay and Kylee did not use a licensed physician to perform the insemination, nor did they file the required consent with the state registrar of vital statistics, as is required in section 39-5403(2). These findings are supported by substantial and competent evidence in the record.

Additionally, the agreement itself suffers from severe inadequacies. For example, rather than addressing Linsay's rights and obligations as the non-donor spouse, the agreement collectively delineates Linsay and Kylee's rights and obligations as "recipients," [2] on the one hand, and the donor's rights and obligations on the other. Critically, the on-line agreement does not contain any language indicating that Linsay, in her capacity as Kylee's spouse, consented to Kylee being inseminated. The agreement does not purport to grant Linsay any parental rights relative to the contemplated child as a nonbiological parent, which is precisely what she is attempting to accomplish by enforcing the agreement. In fact, the agreement contains language appearing to do

---

[2] Based on the language in the form agreement, it cannot be discerned whether Kylee, Linsay, or both were the intended recipient of the semen.

just the opposite. Section 10 of the agreement contains this problematic provision: "*Each party* relinquishes and releases any and all rights *he or she may have* to bring a suit *to establish paternity*." (Emphasis added). Later, in Section 13 of the agreement, it states that "[e]ach party acknowledges and agrees that the relinquishment of rights, as stated above, is final and irrevocable."[3]

Although it is far from clear in the text of the online form used, even if it is inferred from the circumstances that Linsay consented to Kylee being inseminated, compliance with the AIA requires more. For example, the AIA required both Kylee and Linsay to use a licensed physician to perform the insemination. Additionally, the agency rule applicable at the time required Kylee, Linsay, *and the physician* to sign the consent form. IDAPA 16.02.08.900.01 (repealed 2019). Further, the consent form had to be "filed by the physician who performs the artificial insemination with the state registrar of vital statistics." I.C. § 39-5403(2). We cannot assume that such requirements merely reflect a bureaucratic penchant for paperwork and forms. They are an important part of the myriad legal documents which define and protect Idaho families—like marriage licenses, birth certificates, and even decrees of divorce—and they should not be treated cavalierly. Thus, they cannot be easily tossed aside as mere pieces of paperwork.

We affirm the district court in holding that Linsay could not obtain parental rights to the child under the AIA because she did not comply with all the requirements of the law. Further, as will be discussed more fully below, we conclude for purposes of the equal protection arguments asserted by Linsay, there is no evidence in the record that she was denied an opportunity to fully comply with the Act on the basis of her sex.

Notably, Linsay does not argue that the registration requirement and the mandate that the insemination be performed by a physician place an unfair burden or unreasonable restriction on the use of artificial insemination by same-sex couples. Rather, Linsay asserts that she complied with all the code sections *that applied to her*, meaning that she could satisfy Idaho Code section 39-5405(3), which states that the "mother's husband" will have parental rights "if the husband consented to the performance of artificial insemination." According to Linsay, the only thing

---

[3] The dissent suggests that the majority would only enforce the agreement "against Linsay without ever considering its applicability to Kylee." However, as the biological mother of the child, neither the consent form nor the other requirements of the AIA are necessary to establish Kylee's parental rights. There is simply no evidence suggesting that Kylee intended to be a surrogate mother for Linsay and the third-party semen donor. Nevertheless, the dissent's point further illustrates the absurdity of the online form used in this case since it contains such inapplicable language.

9

that matters is her consent to the artificial insemination, and she claims her consent is clear because: (1) Linsay, Kylee, and the donor filled out a form together that Linsay found online; (2) Linsay performed the insemination on Kylee; and (3) Linsay's name was on the birth certificate. In sum, Linsay asks this Court to read Idaho Code section 39-5405 in isolation from the rest of the AIA. We cannot do this.

This Court must rely on the rules of statutory interpretation to determine the requirements of the AIA:

> Statutory interpretation begins with the literal language of the statute. Provisions should not be read in isolation, but must be interpreted in the context of the entire document. The statute should be considered as a whole, and words should be given their plain, usual, and ordinary meanings. It should be noted that the Court must give effect to all the words and provisions of the statute so that none will be void, superfluous, or redundant. When the statutory language is unambiguous, the clearly expressed intent of the legislative body must be given effect, and the Court need not consider rules of statutory construction.

*Farber v. Idaho State Ins. Fund,* 147 Idaho 307, 310, 208 P.3d 289, 292 (2009) (internal citations omitted). When interpreting related statutes, this Court applies the doctrine of *in pari materia*, which requires they "should be taken together and construed as one system, and the object is to carry into effect the intention." *Gomez v. Crookham Co.*, 166 Idaho 249, 457 P.3d 901, 906 (2020) (internal quotations omitted). In order to determine intention, this Court has found "all statutes relating to the same subject are to be compared, and . . . brought into harmony by interpretation." *Id.*

Linsay points to section 39-5405(3) to support her argument that her parental rights under the AIA are "the same" as if the child had been "naturally and legitimately conceived by the mother and the mother's husband, . . ." However, the full text of the AIA provides us with no reason to conclude that we should read section 39-5405(3) in isolation from the rest of the Act. First, all of the other sections of the code make it clear that the various provisions of the AIA were meant to be read in conjunction with one another. Specifically, section 39-5402 states: "[o]nly physicians licensed under chapter 18, title 54, Idaho Code, and persons under their supervision may select artificial insemination donors and perform artificial insemination." Section 39-5403 describes the necessary consents to be obtained and requires the filing of a signed consent form with the state; section 39-5404 places health and safety restrictions on semen donors; and section 39-5407 makes failure to comply with *any* of the three preceding sections a misdemeanor. Therefore, we cannot just ignore that section 39-5405,

which establishes parental rights, sits in the midst of these other sections without any language treating it uniquely from the balance of the Act. Clearly, the legislature did not intend that the other sections named here should be read together, but section 39-5405 is to be read alone. Further, section 39-5406 states ". . . the provisions of this act apply to *all* persons conceived as a result of artificial insemination as defined herein." (Emphasis added). Plainly, all provisions of the AIA apply to each party participating in an artificial insemination with a third-party donor.

Without stating so explicitly, by faulting the majority for its "rigid" adherence to the AIA, the dissent is essentially arguing that we should not strictly enforce a statute when a party has substantially complied with it, or we disagree with it. If the wording of a statute is clear and unambiguously mandatory, it should be enforced as a matter of course. As the Court of Appeals has wisely observed, "[i]f we were to ignore the plain language of [the] statute, then henceforth, no clear and unambiguous statute would be safe from a 'substantial compliance' interpretation." *Poison Creek Pub., Inc. v. Cent. Idaho Pub., Inc*., 134 Idaho 426, 431, 3 P.3d 1254, 1259 (Ct. App. 2000). Additionally, it would be illogical to conclude that the legislature did not intend to require strict compliance with these provisions inasmuch as it made failure to comply with the requirements a misdemeanor. I.C. § 39-5407.

Here, there were numerous provisions of the AIA, outlined above, that were completely disregarded by the parties. The legal requirements of the AIA, which the dissent would have us ignore, are not only designed to promote the health and safety of a child born through artificial insemination, but these requirements also ensure that the child is not adversely affected by the same uncertainty and legal problems demonstrated by this case. These are legitimate policy concerns for the legislature to address.

Additionally, the dissent faults the majority for focusing too heavily on the inadequacies in the parties' agreement. However, the majority has merely taken the agreement as it found it and applied it as written. It is neither hyper technical nor "clever" for us to note the many inadequacies of the online form used by the parties in this case. The dissent correctly observes that we should exercise care in our decisions to protect the family unit because of its "essential role in the welfare of our society." *Pedigo v. Rowley*, 101 Idaho 201, 205, 610 P.2d 560, 564 (1980). However, this cuts both ways. It is not unreasonable or improper for the state to promote a policy requiring a married couple to act carefully and responsibly when making the important and life-altering

11

decision to bring a child into their home through artificial insemination from a third-party semen donor. Such an agreement should not be entered into lightly. Ensuring that such choices are made with due consideration to the legal and medical consequences to the parties and the child is a legitimate public policy concern. Even if we agree with some of the dissent's policy concerns regarding the potential outcomes produced by the AIA, "we have never revised or voided an unambiguous statute on the ground that it is patently absurd or would produce absurd results when construed as written, and we do not have the authority to do so. 'The public policy of legislative enactments cannot be questioned by the courts and avoided simply because the courts might not agree with the public policy so announced.' " *Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho 889, 896, 265 P.3d 502, 509 (2011) (citing *State v. Village of Garden City*, 74 Idaho 513, 525, 265 P.2d 328, 334 (1953)).

The dissent further notes that while this matter was under advisement before this Court, a key provision in the AIA, Idaho Code section 39-5403, was amended by the Idaho legislature. The current version now reads:

> (1) Artificial insemination shall not be performed upon a woman without her prior written request and consent and the prior written request and consent of her husband.
> (2) If the physician who performs the artificial insemination does not deliver the child conceived as a result of the artificial insemination, it is the duty of the mother and her husband to give that physician notice of the child's birth.

ID LEGIS 33 (2021), 2021 Idaho Laws Ch. 33 (H.B. 36). The amendment became effective July 1, 2021. The amended version of section 39-5403 no longer places a duty on the physician who performed the procedure to file the consent form with the state registrar and removes the requirement for the State Board of Health and Welfare to promulgate rules concerning record keeping.

We note that there is no language in the amended statute suggesting that the change should be applied retroactively. *See Kent v. Idaho Pub. Utils. Comm'n*, 93 Idaho 618, 621, 469 P.2d 745, 748 (1970) ("We have long held that "a statute should be applied retroactively only if the legislature has clearly expressed that intent or such intent is clearly implied by the language of the statute."). However, even if the amended statute were retroactively applied to this case, it does not materially change the Court's analysis. The fact remains that the parties did not comply with the

other material provisions of the AIA.[4] Therefore, it is not necessary for us to address whether the amended statute, which only addresses the requirement that the parties' consent be filed with the State Registrar of Vital Statistics, should be applied retroactively.

In sum, applying the provisions of the AIA, we conclude that Linsay never obtained parental rights to the child, with whom she has no legal or biological relationship. Consequently, her argument on appeal fails. We properly leave it to the legislature to address the important public policy and societal implications concerning the AIA that have been raised by the dissent.

**B. It is not necessary for us to address the district court's rulings concerning applicability of the Paternity Act.**

We need not address the district court's conclusion that Linsay could have completed a Voluntary Acknowledgment of Paternity ("VAP") affidavit under the Paternity Act, Idaho Code section 7-1106(1), as another way to secure parental rights because we have affirmed the result on alternate grounds. *Doe I*, 165 Idaho at 42, 437 P.3d at 42. Moreover, it was immaterial whether Linsay *could* have filed a VAP because she clearly did not. Inasmuch as we have concluded that the AIA is the controlling statute in this matter, the district court's discussion concerning whether Linsay could have filed a VAP was dicta. *See State v. Hawkins*, 155 Idaho 69, 74, 305 P.3d 513, 518 (2013) ("If the statement is not necessary to decide the issue presented to the appellate court, it is considered to be dictum . . . .").

Likewise, while we agree with the magistrate and district courts that Linsay could have avoided this outcome by adopting the child, she did not avail herself of this option. *See In re Adoption of Doe*, 156 Idaho 345, 351, 326 P.3d 347, 353 (2014) "The unambiguous language in

---

[4] The dissent raises the hyperbolic concern that "[i]f the most recent amendment to Idaho Code section 39-5403 is not retroactive, as the majority incorrectly concludes, then *all children* born by artificial insemination in Idaho until July 1, 2021, are now presumptively illegitimate." (Emphasis added). This is simply not true. First, the Court has made no determination as to retroactivity—it did not need to do so because other material provisions of the AIA were not complied with by the parties. Second, the AIA is only applicable to children born through artificial insemination where the semen donor is not a spouse. If a married couple using a third-party semen donor complied with the law then in effect, their parental rights should not be affected. Third, as the full testimony from James Aydelotte, Idaho State Registrar of Vital Statistics, referenced by the dissent, demonstrates, a child conceived by artificial insemination in Idaho after the administrative rules lapsed in 2019 may not be subject to the filing requirement. Mr. Aydelotte testified that the administrative rules related to the section's prior version were not renewed in 2019 due to the Governor's Red Tape Reduction Act. Relating to the State Registrar of Vital Statistics: Hearing before the Senate Health & Welfare Committee, 66th Leg., 1st Reg. Sess. (Idaho, Feb. 8, 2021) (testimony of State Registrar James Aydelotte). While we are mindful that the current statutory scheme may cause difficulties for spouses in Linsay's position, judicial restraint requires us to recognize that it is ultimately the legislature's constitutional role and responsibility to modify the applicable statutes if it wishes to provide relief for those who have not complied with the law.

13

I.C. § 16–1501 . . . allows for 'any adult person residing in and having residence in Idaho' to adopt 'any minor child,' . . .").

**C. The district court did not err in affirming the magistrate court's conclusion that it was in the child's best interest for Kylee to be awarded sole custody of the child.**

Notwithstanding the lower courts' determinations as to Linsay's lack of legal status to the child, both courts nonetheless undertook a custody analysis to determine the best interests of the child. Both concluded that it was in the child's best interest for Kylee to be awarded sole custody. We affirm.

In *Troxel v. Granville*, 530 U.S. 57, 65–67 (2000), the U.S. Supreme Court recognized that the Due Process Clause "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." Idaho Code section 32-1010 has codified that right in Idaho law. Child custody determinations are reviewed under an abuse of discretion standard. *Peterson v. Peterson*, 153 Idaho 318, 320–21, 281 P.3d 1096, 1098–99 (2012). The reviewing court "asks first whether the magistrate court correctly perceived the custody issue as one of discretion; then whether the magistrate court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to the court; and finally, whether the magistrate court reached its decision by an exercise of reason." *Id.* "An abuse of discretion occurs when the evidence is insufficient to support a magistrate's conclusion that the interests and welfare of the children would be best served by a particular custody award or modification." *Id.* (quoting *Nelson v. Nelson,* 144 Idaho 710, 713, 170 P.3d 375, 378 (2007)). Factual findings will not be set aside "unless they are clearly erroneous such that they are not based on substantial and competent evidence." *Id.* (quoting *Nelson*, 144 Idaho at 713, 170 P.3d at 378).

The district court affirmed the magistrate court's use of the best interest factors set forth in Idaho Code section 32-717. The magistrate's best interest determination was within the boundaries of that court's discretion and in accord with the U.S. Supreme Court's decision in *Troxel*, in which the Court determined "(1) there is a presumption that a fit parent acts in the best interests of his or her child; (2) a judge must accord "special weight" to a fit parent's decision; and (3) a court may not "infringe on the fundamental right of parents to make child rearing decisions simply because [it] believes a 'better' decision could be made." *Leavitt*, 142 Idaho at 671, 132 P.3d at 428 (citing *Troxel*, 530 U.S. at 68, 71–73).

14

The magistrate court made the following findings and conclusions:

> Kylee is a fit parent. This Court has minimal concerns about Kylee's ability to properly care for [the child]. While it is recognized that Kylee drank alcohol excessively and she committed acts of domestic violence on her partners, this is not a case in which the Court believes at this time her fundamental and constitutional rights to raise her child should be restricted. Kylee has a good healthy relationship with [the child]. Kylee has a constitutional right to make decisions regarding the care, custody, and control of her child. Kylee wishes to restrict Linsay's access to the child.

Important factors cited by the magistrate court in finding Linsay should have no custody or visitation were: (1) the severe "toxicity" and animosity in Linsay and Kylee's relationship, which the magistrate court found would continue if they interacted with one another through the child; (2) that Linsay had not spent much time as the primary caregiver and failed to act in the child's best interests during the period when she temporarily had sole custody by leaving the child with others for thirty-one overnights during a six month span; (3) that Kylee has a healthier relationship with the child than Linsay does; (4) that Linsay creates conflict in the child's community by excluding a beloved daycare provider and grandmother figure—with whom the child has been close since birth—from the child's life; (5) that the existing joint custody schedule has not created stability for the child; (6) that Linsay lied to the court and has a reputation for dishonesty; and (7) that Kylee's history of domestic violence does not indicate that the child is in danger. We note that substantial and competent evidence in the record supports these findings. Accordingly, we affirm the district court in concluding that the magistrate court did not abuse its discretion by granting Kylee sole legal and physical custody, and denying Linsay any third-party custody or visitation.

Linsay argues the magistrate court abused its discretion because it (1) did not consider that Kylee was a "habitual perpetrator of domestic violence under Idaho Code section 32-717B(5)," (2) improperly considered evidence of Linsay's bad character, and (3) improperly found that Linsay committed perjury. We address those issues briefly even though the weight of the evidence supporting the magistrate court's findings without those considerations is sufficient to support the finding that granting Linsay third-party custody is not in the child's best interest.

Linsay maintains the magistrate court abused its discretion because it failed to consider Idaho Code section 32-717B(5), which provides there will be a presumption that joint custody is not in the best interest of the child if one of the parents is "found by the court to be a habitual perpetrator of domestic violence as defined in section 39-6303." However, section 32-717B is inapplicable to this situation because Linsay seeks custody as a third party. We have noted

15

previously that Idaho Code section 32-717, which codifies the best interest of the child factors, applies almost exclusively to custody disputes between parties with equivalent legal interests in the child. *See Leavitt*, 142 at 671, 132 P.3d at 428 ("I.C. § 32–717 applies to custody disputes between equal and competing fundamental interests, with one limited exception when a grandparent seeks custody 'where the child is actually residing with a grandparent in a stable relationship.' "); *Nelson v. Evans*, 166 Idaho 815, 464 P.3d 301, 308 (2020) ("a grandparent seeking visitation rights is entitled to an opportunity to rebut the threshold presumption that fit parents act in the best interests of their children by producing clear and convincing evidence that proves visitation would be in the child's best interests."). The same is true of Idaho Code section 32-717B. There is no presumption of joint custody as between a parent and a third party, nor a presumption that a third-party should be entitled to custody over a parent where the parent is a habitual perpetrator of domestic violence. In short, given Linsay's failure to comply with the AIA, she cannot demonstrate an "equivalent legal interest" that would entitle her to the presumption.

Nevertheless, the magistrate court was fully advised as to Kylee's past domestic violence cases and discussed the incidents in its decision. The magistrate court, having heard the trial testimony, was acutely aware of the incident between Kylee and Linsay. The record indicates there was more to that incident than a mere recitation of the charge would suggest. While the magistrate admittedly did not apply a presumption against Kylee, the magistrate clearly considered the nature of the domestic violence matters and still concluded that it was in the child's best interest for Kylee to be awarded full custody.

Linsay also contends that the magistrate committed an abuse of discretion in admitting character evidence that Linsay had engaged in prostitution twelve years earlier, as a teen. Linsay asserts the prostitution inquiry was too remote in time to be relevant to the custody determination. We have held that the admission of evidence in a non-jury trial is largely left to a judge's discretion, and we will not reverse that decision "on the basis of an erroneous admission of evidence unless it appears that the opposing party was misled or surprised in a substantial part of its case, or that the trial court materially relied on the erroneously admitted evidence." *State v. Powell*, 120 Idaho 707, 710, 819 P.2d 561, 564 (1991) (quoting *Guillard v. Dep't of Employment,* 100 Idaho 647, 603 P.2d 981 (1979)) (internal citations omitted). The character evidence at issue did not mislead or surprise Linsay in a substantial part of her case as she knew character would be analyzed in the magistrate's best interest analysis. Additionally, the magistrate court did not materially rely on this

evidence to the exclusion of other evidence because its best interest determination was based on numerous factual findings primarily focused on more recent examples of Linsay's circumstances and character. We find no reason to reverse the decision based on the admission of this evidence.

Further, in *Roeh v. Roeh*, the Court of Appeals held that, although it would not deny custody to a parent "merely because sometime in the past the parent's conduct indicated a lack of integrity or responsibility," it would also not reject distant evidence of bad behavior if it related to present parental fitness. 113 Idaho 557, 558–59, 746 P. 2d 1016, 1017–18 (Ct. of App. 1987). Instead, remoteness affects the weight of the evidence, generally affording it less weight the further back it goes in time. *Id.* at 559, 746 P.2d at 1018. We conclude that it was not an abuse of discretion for the magistrate court to consider evidence that Linsay had participated in prostitution in the past might be relevant to her present fitness to parent the child. However, given that the behavior occurred twelve years prior, while Linsay was a teenager, it must be afforded substantially less weight. Though we have no measurement of how much weight the magistrate court placed on such evidence, we find the weight of the other factual findings, as detailed above, is sufficient to conclude that granting Linsay custody would not be in the child's best interest.

Finally, Linsay argues that the district court erred in affirming the magistrate court's finding that Linsay committed perjury by lying about whether she had ever engaged in prostitution because it had bearing on her credibility as a witness and her character. Kylee's counsel asked: "So by your testimony, are you telling me you never engaged in sexual acts for money?" Linsay answered, "No." According to the magistrate court and district court, Linsay's negative response indicated she was asserting she had never engaged in sexual acts for money—something that was contradicted in the transcript of a criminal trial in which she had testified. According to Linsay, however, she was directly answering counsel's question, stating that, no, she was *not* asserting she had never engaged in sexual acts for money. Kylee's counsel then questioned Linsay about her testimony in that criminal trial, and Linsay averred she could not remember much because it had been more than ten years ago. When pressed, Linsay answered that she had been forced to work through an escort service and had engaged in prostitution. While Linsay's initial "no" answer, as it appears on the written page of the trial transcript, may seem unclear and could be insufficient to support a finding of perjury standing on its own, we cannot discount the significant advantage that the magistrate court had in actually seeing and hearing all of her testimony on this topic in person. Indeed, the undeniably more nuanced perception of a witness's credibility that can only be

17

perceived by live testimony is the main reason we afford high deference to the findings of the trier of fact. More importantly, even if the magistrate court's factual finding that Linsay committed perjury was incorrect, it was only a single factor in the court's thorough analysis of the child's best interest. Therefore, we conclude that even if the magistrate court erred, the error was harmless because the magistrate court's thorough analysis was based on numerous other permissible factors.

In light of the above analysis, we need not address the third-party standing issue raised by Linsay on appeal or address the applicability of *Stockwell v. Stockwell*, 116 Idaho 297, 299, 775 P.2d 611, 613 (1989). The district court found that any error in the magistrate court's third party standing analysis was cured because the magistrate court nonetheless fully addressed whether giving Linsay custody rights would be in the child's best interest. We agree. Accordingly, it is not necessary for us to address that issue in this opinion.

### D. Kylee is not entitled to attorney fees on appeal.

Kylee seeks attorney fees on appeal pursuant to Idaho Appellate Rule 41 and Idaho Code section 12-121. A court may award reasonable attorney's fees under Idaho Code section 12-121 "when the judge finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation." Kylee asserts that an award is especially appropriate where the appeal "offers no cogent challenge with regard to the trial judge's exercise of discretion." We find that Linsay's appeal was neither frivolous nor lacking in legal foundation. In bringing this appeal, she has raised novel and extremely important legal issues that were matters of first impression for this Court. Accordingly, Kylee's request for attorney's fees is denied.

## VI. CONCLUSION

For the forgoing reasons, we affirm the decision of the district court. We further hold that the AIA—the controlling statute in this case—is constitutional because it can be read in a gender-neutral manner that applies equally to same-sex couples. The AIA provides the same legal protections and places the same legal duties on Linsay as it would on a similarly situated male spouse. Thus, we affirm the district court's ruling upholding the magistrate court's decision that Linsay does not have parental rights to the child because she did not comply with the AIA. Additionally, we affirm the district court's determination that the magistrate court did not err in concluding that awarding sole custody to Kylee was in the child's best interest.

Attorney fees will not be awarded, but Kylee is entitled to costs as a matter of course pursuant to Idaho Appellate Rule 40(a).

18

Chief Justice BEVAN, and Justices BRODY and BURDICK **CONCUR.**

STEGNER, J., dissenting.

In this case, a married couple (albeit of the same sex) undertook to have a child together through artificial insemination. Now, during the process of divorce, the biological mother of the resulting child seeks to deprive her acknowledged spouse of any recognized legal relationship to the child, the effect of which will render the marriage a nullity and deprive the child of parental and financial support. Today, the majority agrees with the biological mother and issues a decision which effectively says that a parent who has consented to (and participated in) her spouse being artificially inseminated is not entitled to be a parent of the resulting offspring because neither she nor a physician filed a never-used and now-obsolete form with the State Registrar of Vital Statistics. In so holding, the majority has delegitimized the non-biological mother's efforts to establish her parental rights and responsibilities. However, the most lasting error in this decision is not the majority's disregard of Linsay's (and also Kylee's) efforts to establish and recognize a parental relationship; it is the refusal to grapple with the consequences of this decision. I think the effect of the majority's opinion is contrary to the public policy of Idaho and jeopardizes the legal protections of a parent whose child was conceived by artificial insemination. For these reasons, I respectfully dissent.

1. <u>The majority's rigid interpretation of the AIA is not only incorrect as a matter of law, but also turns a blind eye to Idaho's public policy favoring legitimacy.</u>

Idaho Code section 39-5406, titled "Application of act," is unequivocally clear: the Artificial Insemination Act (AIA) applies to "*all* persons conceived as a result of artificial insemination[.]" I.C. § 39-5406 (italics added). In other words, the AIA expressly applies to the child, and the resulting inquiry is whether Linsay met the requirements such that the child is entitled to the protections of Idaho Code section 39-5405(3). The majority faults Linsay and Kylee for performing the artificial insemination by themselves and failing to file a consent form with the State Registrar of Vital Statistics. However, the statutory interpretation advanced by the majority runs counter to both the strong public policy favoring legitimacy and to the broad application of the AIA.

19

As a matter of public policy, *this* Court and our Legislature take seriously the protections, joys, and responsibilities resulting from a family unit. "We believe that the integrity of the family plays an essential role in the welfare of our society." *Pedigo v. Rowley*, 101 Idaho 201, 205, 610 P.2d 560, 564 (1980). Accordingly, Idaho law explicitly favors a finding of legitimacy. *Thomey v. Thomey*, 67 Idaho 393, 397, 181 P.2d 777, 779 (1947) ("The rule adopted in this jurisdiction is that the law presumes morality, and not immorality; marriage, and not concubinage; legitimacy, and not bastardy, every intendment of the law leans to matrimony."). Idaho's Legislature also explicitly recognizes the paramount importance of the family. "Implicit in this chapter is the philosophy that *wherever possible family life should be strengthened and preserved*[.]" I.C. § 16-2001 (italics added).

Idaho's public policy supporting family units is evident in the sweeping statute establishing that the AIA applies "to *all* persons conceived as a result of artificial insemination[.]" I.C. § 39-5406 (italics added). It is also reflected in the statute defining the resulting legal relationship between children born by artificial insemination and their parents:

> The relationship, rights and obligation between a child born as a result of artificial insemination and the mother's [spouse] shall be the same for *all legal intents and purposes* as if the child had been naturally and legitimately conceived by the mother and the mother's [spouse], if the [spouse] consented to the performance of artificial insemination.[1]

I.C. § 39-5405(3) (italics added). The AIA is intended to equalize and legitimize children born by artificial insemination; to extend legal protections, rather than jeopardize them; to legally recognize alternative ways of establishing parental rights, not to denigrate them. The statute is clear: the relationship, rights, and obligations attach "if the [spouse] consented to the performance of artificial insemination." *Id.*

The majority's requirement of strict compliance with every section of the AIA undermines this bedrock policy of Idaho's support for the family. The majority states that it refuses to read Idaho Code section 39-5405 in isolation, and that the Legislature mandated strict compliance with *all* sections of the AIA in order for the protections of section 39-5405(3) to apply. However, in doing so, the majority engrafts the language of other provisions onto section 39-5405. As a result, the majority ignores the parties' express intent and undertaking to establish a parent-child

---

[1] The statute uses the word "husband" which has been replaced by "spouse." As the majority notes, the Idaho Legislature has instructed that this substitution is appropriate. *See* I.C. § 73-114(1)(b).

relationship within their legally recognized family unit. *This intent matters.* How can the majority jettison all relevant evidence of consent and intent—evidence that a married couple definitively and consciously undertook the awesome responsibility of parenthood—because a single form was not filed? Linsay assisted in the insemination of her wife Kylee. If that does not evidence her consent, what would? The result of the majority's holding is that the core legal protections of a child conceived by artificial insemination during the course of a marriage would be determined strictly by the filling out and filing of a particular piece of paperwork, rather than by the documented actions and intentions of the spouses.

The majority contends that the consent and notice section sets a requirement for more than a "mere piece of paperwork," equating such a form with those involved in applications for marriage licenses, birth certificates, and divorce decrees. However, this reasoning does not withstand scrutiny. In February 2021, the Idaho State Registrar of Vital Statistics James Aydelotte testified before the Senate Health and Welfare Committee that there has "*never been such a filing [of a couple's written consent to artificial insemination] with the Bureau of Vital Records (BVR) and no purpose exists for either the BVR or the DHW to receive the consent forms.*" *Relating to the State Registrar of Vital Statistics: Hearing before the Senate Health & Welfare Committee*, 66th Leg., 1st Reg. Sess. (Idaho, Feb. 8, 2021) (italics added) (testimony of State Registrar James Aydelotte). Notwithstanding the State Registrar's recognition that there has "never been such a filing . . . and no purpose exists for either the BVR or the DHW to receive the consent forms . . ." the majority concludes otherwise. The effect of which is to dispossess Linsay of her parental rights and responsibilities.

In addition, the majority's erroneous interpretation has significant implications. If the most recent amendment to Idaho Code section 39-5403 is not retroactive, as the majority incorrectly concludes, then all children born by artificial insemination in Idaho until July 1, 2021, are now presumptively illegitimate. The majority invites challenge to the status of these children's recognized relationships in contexts including immigration, citizenship, inheritance, intestate succession, and the rights and benefits of survivors, as well as to child custody, support, and visitation. There will be profound ramifications, many untoward, from today's majority decision. The majority's narrow view of what will satisfy the AIA creates a legal morass and undermines Idaho's public policy of favoring family units.

Whatever the future may bring for those Idaho children created by artificial insemination, the deepest wound wrought *today* by the majority's interpretation is how it renders Linsay's marriage to Kylee a nullity, and eviscerates the legal protections for their child that would otherwise inhere to the family unit. The United States Supreme Court observed that marriage "safeguards children and families and thus draws meaning from related rights of childrearing, procreation, and education." *Obergefell v. Hodges*, 576 U.S. 644, 667 (2015). I am left to wonder how the institution of marriage can protect a child conceived through artificial insemination in Idaho. "Regardless of the method of conception, a child is born in need of support." *In re Parentage of M.J.*, 787 N.E.2d 144, 152 (Ill. 2003). The majority has unequivocally eliminated Linsay's obligations and responsibility to the child with its decision.[2] The majority's refusal to contend with the plain language of Idaho Code section 39-5405(3)—requiring only consent for the rights, relationships, and responsibilities to attach[3]—also runs counter to Idaho's public policy favoring legitimacy and support of the family unit.

2. <u>Kylee and Linsay complied with the consent requirement of the AIA and their child is entitled to the protection of Idaho Code section 39-5405(3).</u>

There can be little doubt that Linsay and Kylee complied with the consent requirements of Idaho Code section 39-5405(3). The AIA sets out the "relationship, rights and obligation between a child born as a result of artificial insemination and the mother's [spouse]" as "the same for all legal intents and purposes as if the child had been naturally and legitimately conceived by the mother and the mother's [spouse], *if the [spouse] consented to the performance of artificial insemination.*" I.C. § 39-5405(3).

The prior version of the AIA's consent and notice statute—in effect at the time of the child's conception and birth—read:

---

[2] The majority's reading of the AIA also leads the Legislature down a path warned against by the United States Supreme Court: "If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972) (citing *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965)).

[3] The majority reasons that "we have never revised or voided an unambiguous statute on the ground that it is patently absurd or would produce absurd results when construed as written, and we do not have the authority to do so." (Quoting *Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho 889, 896, 265 P.3d 502, 509 (2011).) However, the plain language of Idaho Code section 39-5405 is not patently absurd. It is the majority's interpretation, not the plain language of section 39-5405, which produces an absurd result. Consent is all that is required by section 39-5405 for the rights, responsibilities, and relationship to attach to the non-biological parent.

22

(1) Artificial insemination shall not be performed upon a woman without her prior written request and consent and the prior written request and consent of her husband.

(2) Whenever a child is born who may have been conceived by artificial insemination, a copy of the request and consent required under subsection (1) of this section shall be filed by the physician who performs the artificial insemination with the state registrar of vital statistics. The state board of health and welfare shall have the authority to promulgate rules and regulations and to prescribe methods and forms of reporting, and fees to carry out the provisions of this act. Storage, retrieval and confidentiality of records shall be governed by chapter 1, title 74, Idaho Code.

(3) The information filed under subsection (2) of this section shall be sealed by the state registrar and may be opened only upon an order of a court of competent jurisdiction, except that pursuant to chapter 1, title 74, Idaho Code, data contained in such records may be used for research and statistical purposes.

(4) If the physician who performs the artificial insemination does not deliver the child conceived as a result of the artificial insemination, it is the duty of the mother and her husband to give that physician notice of the child's birth. The physician who performs the artificial insemination shall not be liable for noncompliance with subsection (2) of this section if the noncompliance is a result of the failure of the mother and her husband to notify the physician of the birth.

I.C. § 39-5403 (2015).

Linsay and Kylee complied with the "written request and consent" requirement of Idaho Code sections 39-5405 and 39-5403(1). Although "consent" is not defined in the AIA, *see* I.C. § 39-5401, Black's Law Dictionary defines "consent," in relevant part, as "[a] voluntary yielding to what another proposes or desires; agreement, approval, or permission regarding some act or purpose, esp. given voluntarily by a competent person; legally effective assent." *Consent*, BLACK'S LAW DICTIONARY (11th ed. 2019). Linsay and Kylee both signed the artificial insemination agreement, which contemplated their use of donated semen, and delineated that the donor would have no rights to any child(ren). The parties memorialized in writing their intent to undergo artificial insemination and to "sever any and all parental rights and responsibilities" of the donor. This is an "agreement" and "approval" regarding the "act or purpose" of artificial insemination. *See id.* Sections 39-5405 and 5403(1) are satisfied.

Instead of acknowledging what the agreement *says*, the majority emphasizes what the agreement *does not* say: the agreement does not specify "the intended recipient of the semen[,]" nor does it "purport to grant Linsay any parental rights relative to the contemplated child as a nonbiological parent." But these are not required by the statute. These omissions do not change

23

the intent or the written consent of the parties in agreeing that artificial insemination will occur. There is simply no other interpretation of this agreement.

The majority reasons, "Critically, the on-line agreement does not contain any language indicating that Linsay, in her capacity as Kylee's spouse, consented to Kylee being inseminated." This statement flies in the face of the document and the facts. First, the document specifically acknowledges that Linsay and Kylee are *both* recipients of the donor's semen. Second, the statement fails to recognize that the artificial insemination of Kylee was facilitated by Linsay. If that is not indicative of consent, what else would be? And for good measure, Linsay and Kylee are both listed as the child's "mothers" on her birth certificate.

The majority continues, "In fact, the agreement does just the opposite. Section 10 of the agreement contains this problematic provision: '*Each party* relinquishes and releases any and all rights *he **or she** may have* to bring a suit *to establish paternity*.'" (Emphasis in original.) Conveniently omitted and forgotten in this statement and the majority's interpretation is the fact that Kylee is a signatory to this agreement. The majority concludes (wrongly, I suggest) that this provision of the agreement applies *only* to Linsay. There are two "shes" who are party to this agreement, but the majority evidently would enforce it only against Linsay without ever considering its applicability to Kylee.

In addition to the express consent given by both parties, the agreement contained terms and details further indicating their intent consistent with the AIA. A donor is not required by the AIA (or the now-repealed DHW "Request and Consent for Artificial Insemination" form) to sign the spouse's consent, or to expressly disclaim any interest in the resulting child(ren), but here he did. *See* I.C. § 39-5403. The person undergoing artificial insemination is not required to relinquish any right for child support against the donor—this occurs by operation of Idaho Code section 39-5405(1) and (2)—but here both Linsay and Kylee did. The donor is not required to agree that his name will not appear on the birth certificate, but here he did. The parties' expressed intentions are absolutely consistent with the AIA's operation.[4] Accordingly, I would hold that Linsay and Kylee

---

[4] Separately, I also take instruction from this Court's admonition that "[a] court of equity cannot blind itself to the obvious." *Ellis v. Butterfield*, 98 Idaho 644, 657, 570 P.2d 1334, 1347 (1977). Kylee undertook the process to have Linsay listed as the child's "Mother" on the birth certificate, and—like Linsay—signed the insemination agreement which set out the parties' intentions at length. Kylee's change in position squarely implicates the issue of equitable estoppel. While estoppel may not have been specifically pleaded by Linsay, the question nonetheless lurks in the facts of this case: should Kylee be permitted to challenge Linsay's assertion of parental rights when she has taken a diametrically opposed position previously? Several states would answer "no," she may not. *See McLaughlin v. Jones*

complied with the previous version of the AIA, and the child should be legally recognized as Linsay's.

   3. <u>The Legislature's recent amendment to Idaho Code section 39-5403 renders the majority's analysis of Linsay's compliance with the AIA incorrect.</u>

The majority first concludes that the AIA controls, and thereafter turns to whether Linsay's actions are sufficient under the AIA to entitle her to establish her parental rights. The majority acknowledges that while this matter was under advisement, the Idaho Legislature amended Idaho Code section 39-5403 to remove several salient requirements. First, the amended statute omits the requirement that the consent form be filed by a physician with the state registrar. Second, the statute does away with the requirement that the State Board of Health and Welfare promulgate rules regarding record keeping regarding children created by artificial insemination. *See* H.B. 36, 66th Leg., 1st Reg. Sess. (Idaho 2021). The majority concludes, however, that "there is no language in the *amended* statute suggesting that the change should be applied retroactively," and that "it is not necessary for us to address [] the *amended* statute. . . ." (Italics added.) I disagree with the majority's analysis of the statute's recent amendment and its application. First, the majority focuses on the amendment itself, as opposed to the AIA in its entirety, in concluding that the *amendment* is not retroactive. Our case law makes plain that the retroactivity determination applies to the entirety of a "legislative act," here, the AIA. *Guzman v. Piercy*, 155 Idaho 928, 938, 318 P.3d 918, 928 (2014). The majority's conclusion that the amended language, in isolation, is not retroactive fails to take into account language in other AIA provisions indicating that the Act is retroactive. Further, I think such an interpretation disregards the AIA and will wreak significant uncertainty and untold problems for those who were previously parties to an artificial insemination (either the parents who availed themselves of this procedure, or the children who were created thereby).

While I acknowledge we disfavor retroactive legislation, we also recognize that "[w]hen a legislative act is expressly stated to be retroactive, *subsequent amendments to that act are also retroactive*, as long as retroactive application would not violate the Constitution." *Guzman*, 155 Idaho at 938, 318 P.3d at, 928 (citing *Bottum v. Idaho State Police Bureau of Criminal Identification Cent. Sex Offender Registry*, 154 Idaho 182, 184, 296 P.3d 388, 390 (2013)) (italics

---

*in & for Cnty. of Pima*, 401 P.3d 492, 501 (Ariz. 2017); *Laura WW. v. Peter WW.*, 856 N.Y.S.2d 258, 262 (N.Y. App. Div. 2008); *L.M.S. v. S.L.S.*, 312 N.W.2d 853, 855 (Ct. App. Wis. 1981).

added). Express legislative intent will be found "if the language clearly refers to the past as well as to the future[.]" *Id.* To find express legislative intent that the Act is meant to be retroactive, one need look no further than Idaho Code section 39-5406, the provision entitled: "Application of act." It reads: "Except as may be otherwise provided by a judicial decree entered in any action filed before the effective date of this act [July 1, 1982], *the provisions of this act apply to all persons conceived as a result of artificial insemination as defined herein.*" I.C. § 39-5406 (italics added). In no uncertain terms, when the Act came into effect, it applied to *all persons* conceived through artificial insemination—both *prior* to 1982 *and* subsequent to 1982—unless "otherwise provided" by a judicial decree entered in an action filed before the legislation's effective date. *See id.* In other words, only a very small subset of already-adjudicated cases would be exempt from the Act's broad applicability to "all persons conceived as a result of artificial insemination." Accordingly, the statute "clearly refers to the past as well as to the future," and declares express legislative intent that the Act be applied retroactively. *See Guzman*, 155 Idaho at 938, 318 P.3d at 928. It is not difficult to divine why the Legislature made the act retroactive. The Legislature clearly did not want to leave children conceived by artificial insemination in legal limbo. Yet, that is the effect of today's decision. I would take a different course and conclude the recent amendments apply to this case.

Under the recently amended version, Linsay also complied with the consent requirements of the AIA. The amended version reads:

> (1) Artificial insemination shall not be performed upon a woman without her prior written request and consent and the prior written request and consent of her husband.

> (2) If the physician who performs the artificial insemination does not deliver the child conceived as a result of the artificial insemination, it is the duty of the mother and her husband to give that physician notice of the child's birth.

*See* I.C. § 39-5403 (2021). In other words, the Legislature has recognized that the previous statute was much too stringent in its requirements and the amended statute is much more permissive in what is required to comply with the statute. As set out above, Kylee and Linsay entered into an artificial insemination agreement with the donor—in writing which was signed by the parties including Kylee and Linsay. The majority's opinion is too clever by half in its analysis of this agreement. Nothing more than written consent is now required by Idaho Code section 39-5403, and written consent was clearly given. Accordingly, Idaho Code section 39-5405(3) applies to give

26

Linsay the same relationship, rights, and obligations to the child as though Linsay were her biological parent.

As if this document were not enough, *Kylee* also filled out the Birth Certificate Worksheet at the time of the child's birth. As a result of that document's preparation, both Kylee and Linsay are now identified as the child's "mothers" on the child's birth certificate. What more did Linsay need to do to reflect her consent to her spouse's artificial insemination and the assumption of responsibilities to the child created by this process? One suggestion from the majority is that Linsay should have adopted the child. However, she is already listed as the child's mother on the birth certificate. How does this requirement square with the statutory language that says the act applies to: "*all* persons born as a result of artificial insemination"? Because the act applies to this child, Linsay did not need to adopt her because she was already identified as the child's mother on the child's birth certificate. As far as I am concerned, nothing more needed to be done.

Curiously, the majority says it does not have to consider Linsay as being different than a man because it would hold similarly if Linsay *were* a man. Think about that result for a moment. Assume Kylee's spouse is a man named Leonard rather than a woman named Linsay. Leonard is incapable of fathering a child. As a result, Kylee and Leonard download a form from the internet identical to the one signed by Kylee and Linsay. They importune a friend to contribute his semen which will then be used to impregnate Kylee. All three sign the same document, just as Kylee, Linsay, and the semen donor did in this case. Leonard assists Kylee in her artificial insemination, and she delivers a healthy baby girl. Kylee fills out a worksheet which results in Leonard being identified as the father on the birth certificate even though his DNA did not contribute to the baby girl's birth. The marriage disintegrates and divorce proceedings result. Do we tell Leonard that he is not the father of that baby girl and he has no further obligation to her? Do we tell him he needed to adopt that baby girl because he did not do enough under the law to be her father? I think the simple answer to both questions is no; we should not. Such a result flies in the face of Idaho's frequently espoused public policy and exalts form over substance. As I see it, Leonard has done all that needs to be done to be acknowledged as and undertake the attendant responsibilities as the father of that child.

Let us also examine this decision with the shoe on the other foot: Assume Kylee now wishes to hold Leonard responsible for the financial support which would otherwise be due. This decision will be used by lawyers going forward and putative—but not biological—parents in the

27

future to resist child support payments that would otherwise be lawfully owed. The unintended consequences of this decision are hard to quantify, but it is safe to say they will be myriad.

As a coda, I quote the New York Supreme Court of Appeals which has already dealt with this issue in a way I find logically irrefutable:

> [E]quity and reason require a finding that an individual who participated in and consented to a procedure intentionally designed to bring a child into the world can be deemed the legal parent of the resulting child[.] Indeed, "if an unmarried man who biologically causes conception through sexual relations without the premeditated intent of birth is legally obligated to support a child, then the equivalent resulting birth of a child caused by the deliberate conduct of artificial insemination should receive the same treatment in the eyes of the law[.]"

*Laura WW. v. Peter WW.*, 856 N.Y.S.2d 258, 262 (N.Y. App. Div. 2008) (quoting *In re Parentage of M.J.*, 787 N.E.2d at 152).

For the reasons set forth, I respectfully dissent.